AMENDED OPINION
 

 BASSLER, District Judge.
 

 I.
 
 INTRODUCTION
 

 Desiring to alleviate coverage and capacity problems in Harrington Park, Plaintiff Cellular Telephone Company d/b/a AT & T Wireless Services (“AT & T Wireless”) applied to Defendant Zoning Board of Adjustment of the Borough of Harrington Park (the “Board”) for use and bulk variances and for site plan approval to construct a 100 foot cellular telephone monopole and a prefabricated twelve-foot by twenty-foot building for related computerized equipment.
 

 After conducting six hearings at which four expert witnesses of AT & T Wireless testified, and after considering the testimony of its own planner, professional engineer and another expert’s report, as well as comments from objectors, the Board denied the application.
 

 AT & T Wireless then filed this law suit claiming that the Board violated the Telecommunications Act of 1996 as well as the municipal land use law of New Jersey. It wants this Court to issue an injunction requiring the Board to approve the application.
 

 The briefs of the parties interpreting the evidence are worthy of a play by Pirandello: AT & T Wireless emphasizes that the site, located in an Industrial Zone, would remedy the documented deficiencies in its communications net work while the Board, denying the existence of a significant coverage gap, stresses the overutilization of the site by the existing non conforming uses — a residence, two small offices in the basement of the residence, a one-story block structure with three business tenants along with ten eight-foot by twenty-foot storage trailers used by the businesses and the owner. To AT & T Wireless, the site is suitable because the zoning is appropriate and the use passive. To the Board, the site is unsuitable because of the chaotic condition of the many uses already on a corner lot, a little less than a half an acre in size.
 

 The Court agrees with both parties that the litigation can be resolved on their cross motions for summary judgment. What makes this case troublesome for the Court is that while the Board’s denial is correct, its thirty-six page resolution is a smorgasbord of reasons, which at times appear to be pretextual, rather than a balanced evaluation of the evidence. Despite the fact that some of the Board’s findings are not factually supportable and some of its conclusions are not legally sustainable, the question to be resolved is whether the
 
 *560
 
 record as a whole supports the Board’s denial of the variances and site plan.
 

 II.
 
 JURISDICTION, APPLICABLE LAW AND STANDARD OF REVIEW
 

 A.
 
 Jurisdiction
 

 While decisions of local zoning and planning officials are generally a matter of local concern, and absent constitutional considerations their decisions are not the subject matter of federal court review, the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(v), (“TCA”), gives this Court jurisdiction to adjudicate the claim that the Board’s denial violated the TCA. The Court has supplemental jurisdiction to adjudicate Plaintiffs action in lieu of prerogative writ, challenging the Board’s denial on state law grounds under. 28 U.S.C. § 1367.
 

 B.
 
 Applicable Law
 

 1.
 
 Telecommunications Act
 

 The Telecommunications Act, 47 U.S.C. § 332(c)(7) provides:
 

 (7) Preservation of local zoning authority
 

 (A) General authority
 

 Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
 

 (B) Limitations
 

 (i) The regulations of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
 

 (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
 

 (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
 

 (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
 

 (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
 

 (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission’s regulations concerning such emissions.
 

 (v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.
 

 In applying the TCA to a zoning board’s denial of a use variance, the Third Circuit has made it clear that the TCA is violated when either a general policy or an individual decision prohibits, or has the effect of prohibiting personal wireless services.
 
 Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d 64, 70 (3d Cir.1999).
 
 *561
 
 Moreover, a decision has the effect of prohibiting wireless communication services if it results in “ ‘significant gaps’ in the availability of wireless services.”
 
 Ibid.
 
 It is up to the district court to determine what constitutes a significant gap in service and whether the gap can be closed by less intrusive means.
 
 Ibid.
 

 2. New Jersey Land Use Regulation
 

 The regulation of the use of land in New Jersey is a combination (often bewildering) of state statutes, municipal ordinances, and of course, judicial decisions. The starting point here is N.J.S.A. 40:55D-70(d)
 
 [1]
 
 which gives to the zoning board of adjustment the power to:
 

 (d) In particular cases and for special reasons, grant a variance to allow ... a use or
 
 [2]
 
 principal structure in a district restricted against such use or principal structure. But no variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
 

 (footnote added). In addition to granting what is called a use variance, N.J.S.A. 40:55D-70 gives the board of adjustment the power to grant what is called a bulk or dimensional variance:
 

 Where: (a) by reason of exceptional narrowness, shallowness or shape of a spe-cifie piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to article 8 of this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship
 

 To flesh out the statutory grounds for granting a use variance, judicial decisions have developed what is called the “positive criteria” and the “negative criteria.” To satisfy the positive criteria, the applicant has the burden of proving that the use promotes the general welfare. A use is considered to promote the general welfare if the proposed site is particularly suitable for the proposed use.
 
 Medici v. BPR Co.,
 
 107 N.J. 1, 4 526 A.2d 109 (1987);
 
 Smart SMR of New York, Inc. v. Borough of Fair Lawn Bd. of Adjustment,
 
 152 N.J. 309, 323, 704 A.2d 1271 (1998);
 
 New Brunswick Cellular Telephone Co. v. Borough of South Plainfield Bd. of Adjustment,
 
 160 N.J. 1, 5, 733 A.2d 442 (1999). To satisfy the negative criteria the burden
 
 [3]
 
 is on the
 
 *562
 
 applicant to prove that the variance can be granted “ ‘without substantial detriment to the public good.’ ”
 
 Smart,
 
 152 N.J. at 323, 704 A.2d 1271. When the use is not an inherently beneficial one, the “applicant must also demonstrate through ‘an enhanced quality of proof ... that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.’ ”
 
 Ibid,.; New Brunswick Cellular,
 
 160 N.J. at 5, 733 A.2d 442.
 

 If a use is designated as an inherently beneficial one, such as a nursing home or hospital for the emotionally disturbed, there is a presumption that the positive criteria is satisfied and the need to satisfy the negative criteria by an enhanced quality of proof is eliminated.
 
 New Brunswick Cellular,
 
 160 N.J. at 5, 733 A.2d 442. Where the use is an inherently beneficial one, the grant of a use variance “depends on balancing the positive and negative criteria.”
 
 Ibid,
 
 (quoting
 
 Smart,
 
 152 N.J. at 324, 704 A.2d 1271). The Supreme Court of New Jersey has declined to declare that a monopole, such as the one at issue here, is an inherently beneficial use.
 
 Smart,
 
 152 N.J. at 331, 704 A.2d 1271, but has recognized that it serves the general welfare.
 
 [4]
 

 Id.
 
 at 332, 704 A.2d 1271;
 
 New Brunswick Cellular,
 
 160 N.J. at 5, 733 A.2d 442.
 

 C.
 
 Standard of Review
 

 Two standards of review are applicable with respect to the federal claim, depending on what section of the TCA is involved: (1) the substantial evidence standard with deference to local findings; and (2) the non-deferential standard,
 

 When reviewing a Board’s denial of an application to place, construct, or modify personal wireless service facilities, the reviewing court’s task is to determine whether there is substantial evidence in the record as a whole to support the challenged decision. The TCA requires that the decision of the Board “be in writing and supported, by substantial evidence contained in a written record.”
 
 See
 
 47 U.S.C. § 332(c)(7)(B)(iii). Evidence is considered to be substantial if a reasonable mind could accept it as adequate to support a conclusion.
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d at 71. The evidence need not be large or considerable.
 
 Ibid.
 
 The Court cannot weigh the evidence or substitute its own conclusions for those of the Board.
 
 Ibid.
 
 The task of the court is to determine whether there is substantial evidence in the record as a whole to support the Board’s denial of the variances and site plan. Where there is conflicting evidence, the Board, as the fact finder, must adequately explain its reasons for rejecting or discrediting competent evidence.
 
 Ibid.
 

 However, the substantial evidence standard does not apply in reviewing a Board’s findings that there are no significant gaps in the wireless service.
 
 Ibid.
 
 The mandate of 47 U.S.C. § 332(c)(7)(B)(i)(II) that a State or local government or instrumentality thereof “shall not prohibit or have the effect of prohibiting the provision of personal wireless services” is a “statutory bar against regulatory prohibition [that] is absolute and does not anticipate any deference to local findings.”
 
 Ibid.
 

 Under New Jersey law a decision of a zoning board can be set aside only when it
 
 *563
 
 is “arbitrary, capricious or unreasonable.”
 
 Medici,
 
 107 N.J. at 15, 526 A.2d 109. The Court cannot substitute its judgment for that of the board even when it is doubtful about the wisdom of the action. In the absence of a clear abuse of discretion the decision stands. “‘So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere.’ ”
 
 Ibid,
 
 (citing
 
 Kramer v. Bd. of Adjustment Sea Girt,
 
 45 N.J. 268, 296-97, 212 A.2d 153 (1965)).
 
 [5]
 

 III.
 
 DISCUSSION
 

 A. The Positive Criteria
 

 AT
 
 &
 
 T Wireless initially urges the Court to set aside the denial because it violates the law governing land use regulation in New Jersey. This approach is logical since as a general rule the TCA establishes the procedural requirements that local boards must follow in evaluating cell site applications, but leaves intact the state and local law which the boards must apply in arriving at their decision.
 
 Oyster Bay,
 
 166 F.3d at 493-94 (quoting
 
 Cellular Telephone Co v. Zoning Bd. of Adjustment,
 
 24 F.Supp.2d 359, 366 (D.N.J.1998),
 
 aff'd in part, rev’d in part,
 
 197 F.3d 64 (1999)). “In the context of § 332(c)(7)(B)(iii), the decision process itself is governed by applicable state and local zoning laws.”
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d at 72.
 

 AT & T Wireless leased from Charles and Virginia E. Schlemm a portion of then-property on which it planned to install a 100 foot cellular telephone monopole and prefabricated twelve-foot by twenty-foot equipment shelter to house related computerized switching equipment. The Schlemm property is located in the I-Industrial zone, and at the time the Application was filed the proposed telecommunications facility was not a permitted use. The Schlemm property is 20,126 square feet, or approximately 0.46 acres. The property has on it a two-story frame dwelling that is leased to one family consisting of two adults and two children. The dwelling also contains two offices in the basement. H & D Air Conditioning, with one employee, utilizes one office. Charles Schlemm, the owner, utilizes the other office in conjunction with his appliance repair business.
 

 In addition to the frame dwelling accommodating residential and commercial uses, there is a single story block building containing three business tenants: a sculpting business with two employees, an air conditioning business with three employees, and a landscaping business with one employee. In addition to the businesses, the property also contains ten storage containers. Each 8' x 20' container utilizes 160 square feet. Stipulation of Facts (“Stip. Of Facts”), contained in Final Pretrial Order filed January 13, 1999, (“FPTO”) attached as Ex. 40 to Affidavit of Robert M. Vinci (“Vinci Aff.”), 13(5).
 

 Residential uses are not permitted on the property or within the industrial zone. Transcript of Oct. 24, 1996 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 1 to Vinci Aff., (“Oct. 24 Tr.”), 140:14-15. There is no explanation how the commercial uses came to be — whether they all represent valid con-conforming uses, i.e. uses that predated the existing zoning ordinance or whether some or all the uses violate the zoning ordinance. The parties did stipulate that the residential structure
 
 *564
 
 is a non-conforming structure. FPTO, Stip. Of Facts, K 3(23). Because section 53-12 G of the Zoning Ordinance of the Borough of Harrington Park, attached as Ex. 14 to Vinci Aff., (“Zoning Ordinance”), permits no more than one principal building on any lot, the two buildings containing multiple uses violate the existing zoning ordinance.
 

 On September 10, 1996, AT & T Wireless applied to the Board for the following use variances pursuant to N.J.S.A. 40:55D-70(d)(1) and N.J.S.A. 40:55D-70(d)(6):
 

 (1) to permit a use in a district where cellular telephone antennas are not permitted;
 

 (2) to permit more than one principal building on a lot.
 

 (3) to permit the height of a principal structure to exceed by ten °feet or ten percent the maximum height permitted in the district for a principal structure, so that a one hundred foot monopole could be erected in a district where the maximum permitted height of a structure is forty-five feet.
 

 FPTO, Stip. of Facts 113(11). AT
 
 &
 
 T Wireless also applied for the following bulk or dimensional variances pursuant to N.J.S.A. 40:55D-70(c):
 

 (1) to permit a rear yard set back of 12.9 feet where a twenty-five foot set back is required.
 

 (2) to permit the building housing the equipment to have a 5.1 set back where a 15 foot set back is required.
 

 FPTO, Stip. of Facts H 3(11). Finally, AT & T Wireless applied for site plan approval pursuant to the Subdivision and Site Plan Review Ordinance of the Borough of Harrington Park.
 
 Ibid.
 

 AT & T Wireless argues that it satisfied the positive criteria for the grant of a use variance and the Board’s conclusion to the contrary is not supported by substantial evidence. The Board found that there is no “public benefit derived from cellular antennas, since there are CB radio bands available for contacting emergency vehicles and AT
 
 &
 
 T did not produce any proof of any contracts entered into between AT & T and the ambulance, emergency, police, fire, or first aid squad.” Resolution denying AT & T Wireless’ Application adopted by Board of Adjustment of Borough of Harrington Park on May 22,1997 attached as Ex. 10 to Vinci Aff. (“May 22 Resolution”), 1137. Along the same lines, the Board found that “assuming arguendo that the proposed use is not inherently beneficial since it does not fill a bona fide gap and is not needed for emergency services, the Applicant has failed to show that the use generally serves the public welfare.”
 
 Ibid.
 

 The conclusion that AT & T Wireless proposal does not serve the general welfare and does not fill a bonafide gap is not supported by substantial evidence. AT
 
 &
 
 T Wireless is licensed by the FCC to provide wireless communications to the Harrington Park area. Oct. 24 Tr., 11-12. In a decision subsequent to the Board’s resolution, the Supreme Court of New Jersey, while acknowledging that many trial and appellate decisions have recognized that mobile communications facilities are inherently beneficial uses, nevertheless refrained from holding that communications facilities that require constructions of towers or monopoles are inherently beneficial uses.
 
 Smart SMR of New York, Inc.,
 
 152 N.J. at 327-29, 704 A.2d 1271. But the Court did note that “a telecommunications facility is a paradigm for a use that serves a greater community than the particular community,”
 
 Id.
 
 at 332, 704 A.2d 1271, and that “generally, the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare.”
 
 Ibid.
 

 In this case, Scott Mountney, a radio frequency engineer employed by AT & T Wireless, testified that AT & T Wireless is licensed by the FCC to provide wireless communications to the Harrington Park area. Oct. 24 Tr., 11-12. Moreover, he testified that the wireless service in the
 
 *565
 
 Harrington Park area was poor and that the signal strength was unacceptable and unreliable.
 
 Id.
 
 at 57-58; Transcript of Nov. 21, 1996 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 2 to Vinci Aff., (“Nov. 21 Tr.”), 80, 105. On bad days, as many as one out of every ten calls placed in the area is lost or “dropped” because the signal is so weak. Nov. 21 Tr., 80. As many as five to seven percent of the calls placed in this area are lost.
 
 Id.
 
 at 81. He further testified that the proposed facility will remedy this problem and will reduce the number of lost calls to less than one percent.
 
 Id.
 
 at 108.
 

 Mountney also testified that the proposed site would fully comply with all applicable FCC standards and at a power level well below the maximum permitted by the FCC. Oct. 24 Tr., 31-32. Moreover, because it would operate on a unique frequency, far different than those used for radio or television, there would be no interference with radio, television or any other type of electronic use.
 
 Id.
 
 at 33-34. Mountney further testified that the wireless telephone system would provide a unique public benefit. It would be used in emergencies where the land line telephone system fails and would permit fast, reliable access to emergency services to report breakdowns, accidents and suspected drunk drivers. He observed that in some areas, up to half of all 911 calls are placed on cellular telephones.
 
 Id.
 
 at 38-39.
 

 Another advantage of the proposed use would be that the site would provide both digital and analog service. Digital technology provides secure communications and protection from eavesdropping, as well as dispatching and paging services.
 
 Id.
 
 at 70-72. Moreover, Mountney noted that the Harrington Park coverage gap cannot be filled using a cell site located in another community.
 
 Id.
 
 at 40-41, 181; Transcript of Dec. 19, 1996 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 3 to Vinci Aff., (“Dec. 19 Tr.”), 110.
 

 In light of this testimony, all of which was uncontradicted, and the New Jersey Supreme Court decisions in
 
 Smart SMR of New York, Inc.,
 
 152 N.J. at 331, 704 A.2d 1271 and
 
 New Brunswick Cellular,
 
 160 N.J. at 13, 733 A.2d 442, that a FCC license alone generally establishes that a telecommunications tower promotes the general welfare, the Board’s conclusion that the “[alpplicant failed to show that the use generally selves the public welfare” is untenable.
 

 Also untenable is the Board’s finding that the proposed use does not fill a bonafide gap. Mountney testified that “typically on any given day, the cell site that serves this part loses from 5 to 7 percent” of the calls placed in the Harrington Park area. Nov. 21 Tr., 81. The Board contends that this is not a significant gap. Given “the Telecommunications Act’s twin goals of encouraging rapid deployment of new technologies and providing nationwide seamless cellular service to the public,”
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d 64, 69 (3d Cir.1999), and considering the benefits to “the general public, commercial entities, as well as fire, police, and other rescue personnel” that can use the system,
 
 Smart SMR of New York v. Borough of Fair Lawn,
 
 152 N.J. 309, 331, 704 A.2d 1271 (1998), the Court concludes that a loss of five to seven percent is a significant gap. Furthermore, the uncontradicted testimony is that the proposed site would alleviate the capacity problems in Harrington Park Oct. 24 Tr., 29:19-21.
 

 That the proposed cell cite benefits the general public and closes a significant gap does not end the discussion under either New Jersey’s land use law or the TCA. Under New Jersey law, where a use satisfies the requirement of promoting the general welfare, the focus then is on the suitability of the site.
 
 New Brunswick Cellular,
 
 160 N.J. at 13, 733 A.2d 442. The Board found that AT & T Wireless failed to show that the use “is particularly suited for the particular location for which
 
 *566
 
 the variance is sought.” May 22, 1997 Resolution, U37. AT & T Wireless contends that the finding is not based on substantial evidence.
 

 In support of its position that the site is particularly suited for the construction of a monopole, AT & T Wireless’ first witness, Scott Mountney, testified that he did not believe that another viable site was available in the area. Oct. 24 Tr., 48. AT
 
 &
 
 T Wireless’ second expert witness, Jeffrey Kirby, a licensed professional engineer, testified that the proposed construction would meet all construction code regulations,
 
 id.
 
 at 95, would not damage the existing trees on the property,
 
 id.
 
 at 87, would not interfere with the owners access to his buildings,
 
 id.
 
 at 85-86, and because the equipment shed would replace two large trailers on the site the impervious coverage of the lot would actually decrease.
 
 Id.
 
 at 113. The site was appropriate also because in addition to meeting the technical criteria the owner was willing to lease the property which was in an industrial zone. Nov. 21 Tr., 69:1-6.
 

 One of the main concerns of the Board was the fact that the property, a little less than one half acre in size, was already over utilized. May 22, 1997 Resolution, UH 23, 24, 27, 33. In paragraph 23 of the Resolution, the Board stated that it “was particularly concerned from a planning standpoint with this application which did not take into account that there are already numerous uses on the site which will be intensified and effected in a detrimental manner if the application were to be approved.”
 
 Id.
 
 at 1123. The Schlemm property currently contains a two story dwelling used for both residential and commercial purposes, a separate building housing three different commercial uses, ten storage containers and parking of numerous trucks and equipment, including a backhoe and two boats. FPTO, H 3(5); Dec. 19 Tr., 78:6-10.
 

 The Board’s concern is grounded in the uncontradicted evidence with respect to the current uses of the property. Several photographs introduced into evidence during the hearings also depict the jumbled conditions on the property.
 
 See
 
 Ex. 38 attached to Vinci Aff. The Board’s planner, Peter G. Steck, a New Jersey Professional Planner, observed as early as December 1996 in his Planning Memorandum to the Board:
 

 6. The current activities on the property appear to be jumbled and unregulated. There is no distinction of vehicle parking areas and outdoor storage areas. There appear to be inoperable vehicles stored on the property. There is a long non-conforming curb cut along East Railroad Avenue which suggests that the public street is occasionally blocked by maneuvering vehicles. This is a very sensitive location because of the automobile and pedestrian activity related to the municipal recycling facilities in the area.
 

 Planning Memorandum attached as Ex. 23 to Vinci Aff. (“Planning Mem.”), 5.
 

 The Board’s determination that this site is unsuitable for the construction of the monopole and equipment shelter because of the existing conditions on the site also finds support in the testimony of its planner Peter Steck. Steck observed that with the “same number of business, the same number of employees, whatever, the same number of residential units, it seems to me that what is going on there is unacceptable.” Dec. 19 Tr., 93:5-10. With the addition of the equipment shelter, the existing multiple uses are (even if legal non-conforming ones) “being concentrated in a detrimental fashion, because they’re being pushed closer together are all intermixed.”
 
 Id.
 
 at 93:10-17. The number of uses also generated a potential vehicle circulation problem, on and off the property, and raised a public safety issue.
 
 Id.
 
 at 93:13-16. Steck was also troubled by the lack of information about the entire site: where the existing vehicles were being parked, and when and how they exited.
 
 Id.
 
 at 93-94.
 

 
 *567
 
 AT & T Wireless took the position, through counsel representing them at the time, that it need not provide this information and that since its use was a passive one, the Board need only focus on the use of the property for the equipment shelter and monopole. But the Board was well within its rights in evaluating the proposed use in connection with the other uses on the property. The failure of the applicant to address the existing uses on the property undermines its argument that the site is suitable for the proposed additional use. The failure to provide this information, when repeatedly requested by the Board and its planner, also has serious consequences when evaluating the Board’s decision to deny AT & T Wireless’s application for site plan approval, as will be seen in the subsequent discussion.
 

 AT & T Wireless faults the Board for failing to consider that the proposed facility would replace two existing storage trailers on the property. Nov. 21 Tr., 18. There was considerable confusion in the testimony on the removal of the two trailers. AT & T Wireless’s engineer initially testified that two storage trailers would be removed to accommodate the tower and equipment shelter. Oct. 24 Tr., 113:1-8. At the February 27, 1997 meeting, AT
 
 &
 
 T Wireless’ planner indicated that these trailers would remain on site. Transcript of Feb. 27, 1997 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 5 to Vinci Aff., (“Feb. 27 Tr.”), 46:1-3.
 

 However confusing the testimony was at one time, it became clear eventually that two of the trailers were being removed. The Board’s own engineer, Joseph A. Za-niello acknowledged that two of the storage trailers were going to be removed by AT & T Wireless.
 
 Id.
 
 at 60:5-7, 64:1-5, 65. But this error is not significant in light of the balance of the testimony about the overutilization of the site. Moreover, there was evidence that would permit the Board to conclude that the two vehicles in front of the trailers to be removed were being replaced on the site with no information from AT & T Wireless where they would be relocated on the site.
 
 Id.
 
 at 60:1-7, 64-65. Furthermore, Steck testified that “the issue is more the arrangement in use of the site rather than just the gross measurement in terms of building coverage.” Transcript of Jan. 23, 1997 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 4 to Vinci Aff., (“Jan. 23 Tr.”), 44:17-21.
 

 AT & T Wireless asserts that the Schlemm site is the only parcel in Harrington Park that is suitable for the telecommunications facility. The Board was not required to accept this assertion. In response to an inquiry from the audience at the October 24, 1996 meeting, AT & T Wireless zoning board counsel indicated that he would consult with his client as to what information could be provided the Board regarding the applicant’s consideration of alternate sites. Oct. 24 Tr., 64:12-24, 65:12-15. But at the December 19, 1996 meeting, counsel took the position that AT & T Wireless was not obligated to consider alternative sites and its failure to do so could not be the basis for rejecting the application. Dec. 19 Tr., 53:22-25.
 

 AT & T did not explore any other sites,
 
 see
 
 Nov. 21 Tr., 67:21-22, unlike the applicant in
 
 Smart SMR of New York,
 
 152 N.J. at 318, 704 A.2d 1271, who selected the Fair Lawn site only after first considering and rejecting other site locations. Contrary to plaintiffs position, an applicant’s failure to consider other sites has a bearing on the evaluation of the suitability issue.
 
 See New Brunswick Cellular,
 
 305 N.J.Super. at 169, 701 A.2d 1281;
 
 New York SMSA Ltd. Partnership v. Bd. of Adjustment of the Township of Bernards,
 
 324 N.J.Super. 149, 164-65, 734 A.2d 817,
 
 certif. denied,
 
 162 N.J. 488, 744 A.2d 1210 (1999) (“Given the absence of a showing that this was the only site available to meet the needs of plaintiff’s system, a determination that the negative factors
 
 *568
 
 outweighed the positive ones was certainly reasonable and clearly sustainable.”)
 

 A careful reading of the transcript demonstrates that Mr. Scott Mountney, AT
 
 &
 
 T’s expert in the field of radio frequency engineering, never testified that the only way the coverage gap could be resolved in Harrington Park was by placing the monopole on the Schlemm property. Oct. 24 Tr., 9-32. What he did say was that AT & T Wireless identified a coverage gap in the Harrington Park area and that one of the reasons for picking the Schlemm property was because the owner was “a willing landlord.”
 
 Id.
 
 at 49:6-9. Once having picked the Schlemm property as an appropriate locus for the monopole, the options for moving it were then limited. Mountney testified that the cell tower site could be moved five hundred to a thousand feet and still provide the coverage, but moving it a quarter mile to the west would place it in somebody’s house, a quarter mile to the southeast would put it in the reservoir, and a quarter of a mile in any another direction would again put it in either the reservoir or a residential zone.
 
 Id.
 
 at 48-50.
 

 AT & T Wireless’ failure to explore the possibility of other sites in Harrington Park not only adversely impacts its entitlement to a use variance under state law, but also its argument that the Board’s denial prohibited or had the effect of prohibiting personal wireless services in violation of 47 U.S.C.A. § 332(c)(7)(B)(i)(II). Without testimony from AT
 
 &
 
 T Wireless that the proposed site is the only feasible plan and that there are no other less sensitive sites available, there was no way for the Board or this Court to determine “whether there are any less intrusive means for closing that gap.”
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d at 70;
 
 Cf. Sprint Spectrum v. Willoth,
 
 176 F.3d 630, 643 (2d Cir.1999).
 

 In conclusion, the Court cannot second guess the Board’s determination that the Schlemm property with its crowded conditions and overutilization by multiple uses and tenants was “not particularly suited for the particular location for which the variance is sought.” May 22 Resolution, 1137. Substantial evidence supports the Board’s decision and that is all that is required under the TCA and state law.
 

 AT
 
 &
 
 T Wireless also faults the Board’s decision to deny the bulk, variances. This need not detain the Court since it is hard to find that the Board’s decision was arbitrary and unreasonable in light of the fact that the side yard variance for the equipment shelter does not require relief from the zoning ordinance because of the configuration of the property but because of the owner’s unwillingness to reduce the other uses on the property to accommodate an additional use.
 
 See generally
 
 Cox,
 
 New Jersey Zoning and Land Use Administration
 
 (1999).
 

 B.
 
 The Negative Criteria
 

 AT
 
 &
 
 T Wireless also contends that there is no substantial evidence to support the Board’s decision that AT & T Wireless “failed to satisfy the negative criteria set forth in N.J.S.A. 40:55D-70(d) in that the requested use variances cannot be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zoning Plan and Zoning Ordinance of the Borough of Harrington Park.” May 22 Resolution, 1140.
 

 In support of its argument that it satisfied the negative criteria, AT
 
 &
 
 T Wireless relies on the testimony of its fourth witness, Jeffrey Stiles, a licensed professional planner. He testified that the cell tower site would be located in an industrial zone .that is already dominated by industrial, commercial and municipal uses. FPTO, Stip. Of Facts, 113(8). Stiles noted that because of the many mature trees in this area, the visual impact of the monopole would be minimal. Oct. 24 Tr., 148. He testified that the cell tower site would not have a substantial impact on the public good or the zone plan or zoning ordinance
 
 *569
 
 because the proposed facility would not generate a safety or health impact.
 
 Id.
 
 at 163. In Stiles’ opinion, the location is consistent with the municipal zoning plan because it would be located in an industrial zone and would not be out of character with the existing industrial, commercial and municipal uses in the area.
 
 Id.
 
 at 164. Since the proposed use would be a passive use, it would not increase the intensity of the use of the property, would not generate any additional traffic, and with the removal of two storage trailers, would represent a( better arrangement.
 
 Id.
 
 at 165; Nov. 21 Tr., 17-18; Transcript of April 24, 1997 Hearing before Zoning Board of Adjustment for the Borough of Harrington Park attached as Ex. 6 to Vinci AH’., (“April 24 Tr.”), 13.
 

 In contrast to this rosy picture,
 
 [6]
 
 Steck, the Board’s planner, opined that, with the desire of the property owner to retain as much of the nonconforming activity on the site as possible, serious issues relating to public safety were raised by the lack of regulation as to how vehicles access the site, resulting in the adjoining roadway being blocked.
 
 Id.
 
 at 90-91; 92:1-3; Planning Mem., 1f 5. This was of particular concern because the municipal recycling center adjoins the property.
 
 Id.
 
 In Steck’s opinion, the concentration of the numerous uses in a smaller area of the site adversely affected vehicular circulation resulting in an unacceptable and detrimental impact on public safety. Dec. 19 Tr., 93:5-17. Because none of the uses are being removed, but only rearranged and concentrated, Steck stated that “there is substantial detriment to further confine and rearranging that-those series of nonconforming uses.”
 
 Id.
 
 at 94:10-13.
 

 Again the planner, both in his report to the Board and his testimony, expressed his concern that more information was needed from the applicant as to the existing uses in order to fully evaluate the impact of adding a twenty-foot by forty-foot fenced area.
 
 Id.
 
 at 92, 94; Planning Mem. ¶¶ 6, 7.
 

 AT & T Wireless argues that there is no adverse impact on the zoning ordinance or master plan because the use is compatible in an industrial zone. As further weight to the compatibility of the use, AT & T Wireless points to the fact that the Borough has subsequently amended its zoning ordinance to permit a telecommunications facility in the I-Industrial zone. But it hardly seems arbitrary or unreasonable for the Board to evaluate the proposed use in connection with the existing uses on the property. After all, AT & T Wireless is not proposing a variance to permit a use on a vacant lot, but on one already overcrowded with a multiplicity of uses.
 

 In an attempt to minimize the fact that its proposed facility has a minimal effect on the requirement of the zoning ordinance that not more than one principal building shall be permitted on any lot in the Industrial District,
 
 see
 
 Zoning Ordinance § 53-12 G, AT & T argues that the equipment shelter and monopole is an accessory use; that is, one that is subordinate and minor in significance and is reasonably related to the primary use.
 
 Charlie Brown of Chatham,, Inc. v. Bd. of Adjustment for Chatham Township,
 
 202 N.J.Super. 312, 324, 495 A.2d 119 (App. Div.1985). The Borough Ordinance mirrors this definition: an accessory building is “subordinate to the main building on a lot, the use of which is customarily incidental to the use of the main building.” Zoning Ordinance, § 53-3. Clearly a monopole and equipment shelter is not an accessory to any of the numerous principal uses on the site.
 

 There are many findings in the Board’s Resolution that can be legitimately criticized. The Board was concerned that the installation of the monopole might disturb the root system of the existing trees. May
 
 *570
 
 22 Resolution, ¶ 30. The testimony was that it would not. The Board was concerned that the facility would present a constructive nuisance to children.
 
 Id.
 
 at ¶ 29. The testimony was that the facility would be fenced in. The Board determined that the use variance would cause a deterioration of the industrial area.
 
 Id.
 
 at ¶ 40A. There was no evidence to support that finding.
 
 See Lincoln Heights Ass’n v. Township of Cranford Planning Bd.,
 
 314 NJ.Super. 366, 376, 714 A.2d 995 (1998) (noting that boards may consider only sworn, competent testimony),
 
 aff'd
 
 321 N.J.Super. 355, 729 A.2d 50 (App.Div.),
 
 certif. denied,
 
 162 N.J. 131, 741 A.2d 99 (1999).
 

 But the Board cannot be faulted for accepting the testimony of its Planner. The Board’s concern about the overutilization of the site with the problems that it creates was legitimate. Substantial evidence does not mean a large volume of evidence, but enough that a reasonable mind would accept as adequate to support the conclusion.
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 197 F.3d at 71. Applying that standard, there is substantial evidence to support the conclusion that the use variance and bulk variances could not be granted without substantial detriment to the public good and without substantially impairing the intent and the purpose of the zoning ordinance of Harrington Park.
 

 C.
 
 The Site Plan
 

 The Board also denied the application of AT & T Wireless for site plan approval. May 22 Resolution, 37.
 
 [7]
 

 The Borough of Harrington Park has in place a site plan ordinance. Subdivision and Site Plan Ordinance of the Borough of Harrington Park § 45A-1. The site plan is statutorily defined as follows:
 

 “Site plan” means a development plan of one or more lots on which is shown (1)
 
 existing
 
 and proposed conditions of the lot, including but not necessarily limited to topography, vegetation, drainage, flood plains, marshes and waterways, (2) the
 
 location of all existing
 
 and proposed buildings,
 
 drives, parking spaces, walkways, means of ingress and egress,
 
 drainage facilities, utility services, landscaping, structures and signs, lighting screening devices and (3)
 
 and other information that maybe reasonably required in order to make an informed determination
 
 pursuant to an ordinance requiring review and approval of site plans by the planning adopted pursuant to article 6 of this act.
 

 N.J.S.A. 40:55D-7 (emphasis added).
 

 Steck, in his planning memorandum to the Board dated December 17, 1996, first raised the concern about the lack of information regarding the entire property:
 

 Additional information is needed from the applicant for the Board of Adjustment to make a determination regarding the impact of the proposed facility on the remaining uses. The existing uses represent a poor land use configuration that is exhibited by setback violations, unregulated traffic flows within and to and from the site and a general unaesthetic appearance. There may also be significant safety concern such as the location of a business use in the basement of a wood-frame dwelling. While these other uses may not be directly controlled by the applicant, they are part of the entire site and bear on a finding concerning satisfaction of the negative criteria. Because the applicant is also seeking site plan approval, a more detailed view of the entire site is warranted.
 

 Planning Mem., ¶ 7 (emphasis added).
 

 Steck’s concern about the lack of information on the site plan about the current
 
 *571
 
 uses on the property was also expressed repeatedly during his testimony:
 

 • [W]e simply don’t have enough information on what is going on the remainder of the property to make that judgment;
 

 • But it seems to me from a planning point of view, you want to know what’s going on in the site, and we don’t know that today;
 

 • Well, I think one would need to have a site plan showing the entire parcel to have an understanding of what is currently on the property in terms of uses, to understand whether those uses are legal or illegal, and how they change in terms of different seasons.
 

 Jan. 23 Tr., 27-28.
 

 • And the applicant is asking for waivers of some of the information on the remainder of the site, and in my opinion, you need that information to make a sound judgement.
 

 Dec. 19 Tr., 94:2-6.
 

 Steck’s concerns about traffic circulation and parking locations are typical site plan considerations. To this legitimate concern of the planner and the Board, the applicant’s then attorney responded that it was not required to provide a site plan for the entire property.
 
 See
 
 April 24 Tr., 25:15-19; 26:1-2. This is legally incorrect in so far as the applicant is refusing to provide information regarding the location on the site plan of the existing parking locations and traffic circulation.
 

 The statutory definition of site plan contemplates that it should show the location of not just the proposed conditions, but the existing conditions, and not just the proposed buildings and drives and parking spaces, but the existing ones as well. N.J.S.A. 40:55D-7(1) and (2). Former counsel’s position ignores also the statutory language that a site plan should contain information reasonably required for the Board to make an informed determination. N.J.S.A. 40:55D-7. If former counsel felt that a “full blown” site plan was not warranted, he could have requested waivers where appropriate.
 

 The position of AT & T Wireless that the existing conditions on the remainder of the site were not its concern and should be a matter of code enforcement by the Borough defies common sense and case law. “It is also well established that if a site plan lacks sufficient specificity or if an applicant has failed to provide information pertinent to a plan, the plan may be denied on that basis.”
 
 Morris County Fair Housing Council v. Boonton Township,
 
 228 N.J.Super. 635, 642, 550 A.2d 777 (1988). Questions
 
 of
 
 parking, traffic circulation, and ingress and egress are too important to be left to another day.
 
 See Hamlin v. Matarazzo,
 
 120 N.J.Super. 164, 293 A.2d 450 (Law Div.1972) (question of proper drainage should be resolved before approval).
 

 Because AT & T Wireless refused to submit a revised site plan addressing the concerns of the Board’s planner and the Board, the Board was justified in denying the application on that basis alone.
 
 [8]
 

 D.
 
 17 U.S.C.A. § 332(c)(7)(B)(i)(II)
 

 AT
 
 &
 
 T Wireless argues that the Board’s decision violated 47 U.S.C. § 332(c)(7)(B)(i)(II) because this provision prohibits “policies that do not explicitly ban new service but do, when applied on a case-by-case basis, guarantee the rejection of every application.”
 
 AT & T Wireless PCS, Inc. v. City Council of City of Virginia Beach,
 
 155 F.3d 423, 429 (4th Cir.1998). AT & T Wireless points to the Board’s finding that: (1) because “there are or will be towers in all surrounding towns, there will be sufficient coverage and accordingly, no need to place the tower in Harrington Park,” May 22 Resolution,
 
 *572
 
 H16; and (2) there exists “new technology” that offers “an attractive alternative to the towers.”
 
 Id.
 
 at 1119.
 

 The Court agrees with AT & T Wireless that the Board’s denial of the facility based on these reasons is nothing more than the implementation of facially neutral policies that do not explicitly ban new service but do, when applied on a case-by-case basis guarantee the rejection of every application.
 

 The Board’s findings represent one of the smorgasbord of reasons that the Board put in its resolution denying AT
 
 &
 
 T’s application. But it is not fatal. A fair reading of the entire transcript leads the Court to the conclusion that the core of the Board’s decision rested on an individual zoning decision relating to a specific property already overcrowded with multiple uses and the applicant’s failure to respond to the Board’s legitimate and traditional planning and zoning concerns. Once having reached a decision on legitimate grounds, everything but the kitchen sink was thrown in to buttress the decision. But evidence that the Board was not banning all telecommunication facilities can be found in the planner’s report and testimony. Moreover, Steck acknowledged that the proposed use was, in his opinion, inherently beneficial and if the site were a vacant lot, the application might satisfy the positive and negative criteria.
 

 Because the denial is also based on legitimate grounds, the Court concludes that the Board has not violated the TCA.
 
 See Iowa Wireless Servs., L.P. v. City of Moline Ill.,
 
 29 F.Supp.2d 915 (C.D.Ill.1998).
 

 E.
 
 Health Effects of EMF Radiation Emissions
 

 AT & T Wireless argues that the Board exceeded its authority when it considered the possible health effects of radiation in denying the application. It is correct. Both the New Jersey Radiation Protection Act and the TCA
 
 [9]
 
 prohibit the Board from considering the long-term health effects of EMF radiation, so long as those emissions comply with applicable regulations.
 
 See
 
 N.J.S.A. 26:2D-17; 47 U.S.C.A. § 332(c)(7)(B)(iv);
 
 Smart,
 
 152 N.J. at 326, 333-34, 704 A.2d 1271.
 

 AT & T Wireless’s witness, Gerry Ze-man, a radiation protection specialist and health physicist employed by Bell Laboratories, testified that the facility would operate well below the maximum permissible emission levels. Oct. 24 Tr., 125-26. AT
 
 &
 
 T argues that the Board relied on the possible health effects in denying the application by pointing to paragraph 21 of its findings of fact:
 

 [w]hen asked to comment with respect to the potential health hazards resulting from exposure to low levels of radiation, the Applicants health physicist ... refused to comment stating only that the cellular antenna was far below the
 
 maximum
 
 levels permitted under FCC Regulations and the New Jersey Radiation Protection Act.
 

 May 22 Resolution, ¶21.
 

 In response, the Board now claims that “it is clear from a reading of the Board’s memorialization that this issue played no role in the Board’s rejection of the application,” and that the “Board made no reference to 'health effects or illness in its denial of the application.” Def.’s Moving Br. at 32, 33. This explanation is unconvincing. If health considerations played no role why refer adversely to the expert’s testimony in the findings of fact?
 

 Nevertheless, the “finding” is sufficiently ambiguous that it cannot serve as a basis for invalidating the Board’s decision. That is particularly true when the Board’s
 
 *573
 
 denial rests on legitimate zoning concerns.
 
 See Iowa Wireless Servs. L.P.,
 
 29 F.Supp.2d at 924 (“the decision which denied IW’s application articulated other reasons besides that of environmental concerns.”)
 

 F.
 
 Unauthorized Withdrawal of Escrow Funds
 

 In its Third Count, AT & T Wireless seeks the return of escrow fees in the amount of $3,700.00. Over the objection of AT & T Wireless,
 
 see
 
 April 24 Tr., 30-41, the Board retained Perry L. Schwartz to render a report regarding the health effects of the proposed telecommunications facility. Schwartz did not testify, but submitted a written report to the Board. April 4, 1997 Report of Intertech Ass’n, Inc. attached as Ex. 26 to Vinci Aff. (“April 4 Report”). AT & T Wireless claims that the Board cannot legitimately require it to pay for Schwartz’s services because “the subject upon which Mr. Schwartz would purportedly testify was not within the jurisdiction of the defendant.” Compl., ¶ 59. In response, the Board, relying on the provisions of N.J.S.A. 40:55D-53.2a, requiring applicants to be responsible for payment of consultants, contends that it retained Schwartz to “address the methodology of radio frequency measurements” rather than to evaluate safety or health issues. Def.’s Br. In Support of Motion for Summary Judgment, at 37.
 

 The Board was precluded by the TCA from considering the health consequences of radio frequency emissions.
 
 Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township,
 
 20 F.Supp.2d 875, 880 (E.D.Pa.1998),
 
 aff'd,
 
 181 F.3d 403 (3d Cir.1999). The health issue was raised by objectors. Reading the colloquy at the hearing regarding the Schwartz report as well as the report itself,
 
 [10]
 
 it appears to this Court that Mr. Schwartz was, in fact, retained to examine the health consequences of radio frequency emissions.
 

 Since the Board did not have the authority to consider the health consequences of radio frequency emissions, the Board did not have the right to hire an expert on this subject at the expense of AT & T Wireless. Therefore, AT & T is entitled to Judgment in the amount of $3,700.00.
 

 G.
 
 Reasonable Time
 

 AT & T Wireless’ claim that the Board did not act upon AT & T Wireless’ application within a reasonable period of time is without merit. AT & T Wireless contends that the Board violated the TCA by failing to act upon AT & T Wireless’ application within a reasonable period of time. The Board responds that the seven months that passed between the time that AT
 
 &
 
 T Wireless applied for the variances and the time that the Board memorialized its decision in a resolution, seven months, was reasonable.
 

 According to the TCA, when an applicant requests a state or local government to authorize the placement, construction or modification of a personal wireless service facility, the government or instrumentality must act “within a reasonable period of time after the request is duly filed.” 47 U.S.C. § 332(c)(7)(B)(ii). Pursuant to the New Jersey Municipal Land Use Law (“MLUL”), in order to avoid a default judgment in favor of an applicant, a board must decide whether a variance will be granted within 120 days of the applicant’s original request. N.J.S.A. 40:55D-73(b). Furthermore, the MLUL requires the board to adopt a resolution memorializing its decision within forty-five days of the date upon which that decision was made. N.J.S.A. 40:55D-10(g)(2).
 

 Both parties agree that AT & T Wireless filed its application with the Board in September 1996 and that hearings to con
 
 *574
 
 sider the application were held on October 24, 1996, November 21, 1996, December 19, 1996, January 23, 1997, February 27, 1997, and April 24, 1997. FPTO, Stip. of Facts, ¶ 12. Also, the parties do not dispute that the Board memorialized its decision in a resolution adopted on May 22, 1997.
 
 Id.
 
 at K19. Finally, both AT & T Wireless and the Board acknowledge that AT
 
 &
 
 T Wireless extended the Board’s deadline for making a decision until April 30,1997.
 
 See id.
 
 at ¶¶ 15-17.
 

 In a similar case, this Court found that a board responding to an application submitted by a wireless telecommunications company acted within a reasonable period of time despite the fact that the board conducted forty-four hearings over the course of 2)£ years before rendering a decision.
 
 Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 24 F.Supp.2d at 365. Central to that decision was the fact that the applicant consented to extend time.
 
 Ibid.
 

 Likewise, in this case, AT & T Wireless consented to extend the deadline until April 30, 1997. As a result, when the Board voted against the application during the April 24, 1997 meeting, the Board satisfied the requirement that their decision be rendered within a reasonable period of time. In addition, when the Board memorialized its decision by adopting a resolution on May 22, 1997, the Board was well within the forty-five day deadline required by the MLUL.
 

 IV.
 
 Conclusion
 

 Plaintiff AT & T Wireless has not shown that it is legally entitled to a reversal of Defendant’s denial of its application for variances and site plan approval necessary to construct a one hundred foot monopole with cellular telephone antennas attached and a twelve-foot by twenty-foot equipment shelter housing ancillary telecommunications equipment. Judgment will therefore be entered against Plaintiff AT
 
 &
 
 T Wireless on its motion for summary judgment and in favor of Defendant Board on its motion for summary judgment (except as to the issue of expert fees). As to the issue of expert fees, judgment will be entered in favor of Plaintiff AT
 
 &
 
 T Wireless and against Defendant Board in the amount of $3,700.00.
 

 [1]
 

 . This is the wording of the statute at the time of the application and decision. It was subsequently amended in June of 1997. The amendment does not affect this case.
 

 [2]
 

 . In addition to a variance to permit a use that the zoning ordinance prohibits, there is also a variance from a specification or standard in the ordinance applicable to a conditional use, i.e. a use permitted by the ordinance but subject to certain conditions, called a (d)(3) variance. N.J.S.A. 40:55D-70(3). The burden of proof and standards for a (d)(3) variance and a use variance are different.
 
 See generally
 
 Cox, New Jersey Zoning and Land Use Administration (1999). When the opinions in
 
 Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus,
 
 24 F.Supp.2d 359 (1998),
 
 aff'd in part, rev’d in part,
 
 197 F.3d 64 (3d Cir.1999), refer to a conditional use variance, they are really referring to a use variance, which is the subject also of this litigation.
 

 [3]
 

 . AT & T Wireless contends that the TCA’s substantial evidence requirement shifts the burden of proof to the Board. That argument echoes the dissent in
 
 New Brunswick Cellular Telephone Co. v. Borough of South Plainfield Bd. of Adjustment,
 
 305 N.J.Super. 151, 175, 701 A.2d 1281 (App.Div.1997),
 
 opinion after remand
 
 314 N.J.Super. 102, 714 A.2d 315 (App.Div.1998),
 
 rev’d
 
 160 N.J. 1, 733 A.2d 442 (1999). The proper allocation of the burden
 
 *562
 
 of proof is one of the many potential question raised by the TCA’s interplay with state zoning and planning law.
 
 Cellular Telephone v. Oyster Bay,
 
 166 F.3d 490, 494 (2d Cir.1999). But as in
 
 Oyster Bay,
 
 this case can be decided without the resolution of that issue.
 

 [4]
 

 . Although the Court in
 
 Smart SMR of New York, Inc.
 
 determined that the monopole was not an inherently beneficial use, in determining whether the applicant had satisfied the negative criteria, N.J.S.A. 40:55D-70(d), it proceeded to weigh the positive and negative criteria as it "would with an inherently beneficial use” to determine whether, "on balance, the grant of the variance would cause a substantial detriment to the public good.”
 
 Smart SMR of New York, Inc.,
 
 152 N.J. at 332, 704 A.2d 1271 (citing
 
 Sica v. Bd. of Adjustment,
 
 127 N.J. 152, 166, 603 A.2d 30 (1992)).
 

 [5]
 

 . Since both the TCA, (other than evaluating a claim under 47 U.S.C. § 332(c)(7)(B)(i)(II)) and state law employ the substantial evidence standard, the findings of the Board are entitled to deference. Under New Jersey law, a trial judge must give “greater deference” to a zoning variance denial than to a grant.
 
 Nynex Mobile Communications v. Hazlet Township Zoning Bd.,
 
 276 N.J.Super. 598, 648 A.2d 724 (App.Div.1994). This "super deference” would no longer seem viable when analyzing the federal claim in light of the Second Circuit’s opinion that denials subject to the TCA are reviewed "more closely than standard local zoning decisions.”
 
 Oyster Bay,
 
 166 F.3d at 493.
 

 [6]
 

 . Sleek assumed the use to be a beneficial one and observed that if the lot were vacant, with suitable landscaping, the application might satisfy both the positive and negative criteria. Dec. 19 Tr., 88:23-25, 89:1-2.
 

 [7]
 

 . Since AT & T sought a use variance, the board of adjustment had the power to grant site plan approval to the same extent as a planning board. N.J.S.A. 40:55D-76(b);
 
 see
 
 36
 
 New Jersey Practice, Land Use Law,
 
 § 1434 at 300-301 (2d ed.1999).
 

 [8]
 

 . Later in the proceeding, AT & T Wireless’ expert finally got around to telling the Board what he saw on the site. That hardly complies with an applicant’s obligation to furnish the information on a site plan.
 

 [9]
 

 . “No state or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency transmissions to the extent that such facilities comply with the Commission’s regulations concerning such emissions.” 47 U.S.C.A. § 332(c)(7)(B)(iv).
 

 [10]
 

 . The last paragraph of the report is revealing as to the purpose of the report: “At the present time, there has not been sufficient evidence of a positive or negative nature indicating that the projected levels at this installa tion will create any form of health hazard.” April 4 Report, 5.