733 A.2d 442

NEW BRUNSWICK CELLULAR TELEPHONE COMPANY, D/B/A COMCAST CELLULAR ONE, PLAINTIFF–APPELLANT, v. BOROUGH OF SOUTH PLAINFIELD BOARD OF ADJUST-MENT, DEFENDANT–RESPONDENT, AND TED DABROWSKI, KAZ DABROWSKI, KARL KOLAR, SALLY KOLAR, VINCENT J. DOTOLI AND LOUISA DOTOLI, INTERVENORS–RESPON-DENTS.

Argued May 3, 1999—Decided June 30, 1999.

2

*Gregory J. Czura* argued the cause for appellant.

*James F. Clarkin, III,* argued the cause for respondent (*Borrus, Goldin, Foley, Vignuolo, Hyman, Stahl & Clarkin,* attorneys; *Mr. Clarkin* and *Rosalind Westlake,* on the brief).

*David J. Frizell* argued the cause for intervenors respondents (*Vincent J. Dotoli,* attorney; *Mr. Dotoli,* on the briefs).

*Richard D. Stanzione* submitted a brief on behalf of *amicus curiae*, Bell Atlantic Mobile, Inc. (*Hiering, Dupignac & Stanzione*, attorneys; *Mr. Stanzione* and *Eli L. Eytan*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The issue in this appeal is whether respondent, Borough of South Plainfield Board of Adjustment (the Board) arbitrarily, capriciously and unreasonably denied the request of appellant, New Brunswick Cellular Telephone Co., d/b/a Comcast Cellular Communications (Comcast), for use and bulk variances to construct a monopole for cellular communications. More specifically, the issue is whether the Board erroneously concluded that Comcast had not satisfied the "positive" and "negative" criteria entitling it to a use variance under *N.J.S.A.* 40:55D–70(d). Finding that the Board had erred, the Law Division directed approval of both variances. The Appellate Division reversed. 314 *N.J.Super.* 102, 104, 714 *A.*2d 315 (1998). Because of a dissent in the Appellate Division, Comcast appealed as of right. We reverse and reinstate the judgment of the Law Division.

I.

This appeal arises from the continuing tension between the expanding public demand for wireless communication and the concern of local government about the location of cell towers and monopoles. A brief summary of the law pertaining to use variances will place the appeal in perspective.

At the time of the Board's hearings, the governing statute, *N.J.S.A.* 40:55D–70d stated:

In particular cases for special reasons, (a board of adjustment may) grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard ... pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio ..., (5) an increase in the permitted density ..., except as applied to the required lot area for a lot or lots for detached one or two

dwelling unit buildings, which lot or lots are either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure. . . .

No variance or other relief may be granted under the terms of this section unless such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

On June 30, 1997 the legislature amended the second paragraph of subsection d to read:

No variance or other relief may be granted under the terms of this section, *including a variance or other relief involving an inherently beneficial use, without a showing that* such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

The first paragraph in subsection d refers to the "positive criteria" and the second paragraph "the negative criteria" necessary for the grant of a use variance. Generally speaking, "to satisfy the positive criteria, an applicant must prove that 'the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.'" *Smart SMR of New York, Inc. v. Fair Lawn Board of Adjustment,* 152 *N.J.* 309, 323, 704 *A.*2d 1271 (1998) (quoting *Medici v. BPR Co.,* 107 *N.J.* 1, 4, 526 *A.*2d 109 (1987)); *see also* William M. Cox, New Jersey Zoning and Land Use Administration § 7–5.2 (1999). Further, "[t]o satisfy the negative criteria, in addition to proving that the variance can be granted 'without substantial detriment to the public good,' an applicant must demonstrate through an 'enhanced quality of proof . . . that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.'" *Smart, supra,* 152 *N.J.* at 323, 704 *A.*2d 1271 (quoting *Medici, supra,* 107 *N.J.* at 21–22, 526 *A.*2d 109); *see also Cox, supra,* at § 8–2. An inherently beneficial use presumptively satisfies the positive criteria, and eliminates the need to satisfy the negative criteria by an enhanced quality of proof. *Smart, supra,* 152 *N.J.* at 323, 704 *A.*2d 1271. Grant of a use variance for an inherently beneficial use "depends on balancing the positive and negative criteria." *Id.* at 324, 704 *A.*2d 1271.

■ In *Smart*, we refrained from declaring towers and monopoles to be inherently beneficial uses. *Id.* at 329, 704 *A.*2d 1271. Instead, we recognized that they serve the general welfare "and thereby satisf[y] the positive criteria if the use is particularly suited for the proposed site." *Id.* at 332, 704 *A.*2d 1271. That qualified recognition left telecommunications carriers with the obligation to satisfy the negative criteria. The carriers also must prove that, when balancing the proof on the positive and negative criteria, the grant of the variance would not cause substantial detriment to the public good. *Ibid.*

Until the issuance of our opinion in *Smart*, the Law Division and the Appellate Division had considered towers and monopoles to be inherently beneficial uses. *Id.* at 328, 704 *A.*2d 1271 (listing cases). Here, Comcast proceeded before the Board on the assumption that its monopole was such a use. Although the Board also assumed that the monopole was an inherently beneficial use, it denied the requested use variance.

The Board concluded that Comcast had failed to meet its burden of proving that the monopole would not pose a substantial detriment to the public good, the zone plan, and the zoning ordinance. Additionally, the Board found that the site was inappropriate for a monopole and that the monopole did not provide a public benefit. The Board concluded that the minimal benefit from the proposed monopole did not outweigh the public detriment it imposed.[1]

---

[1] The resolution states:

*FINDINGS*

1. The applicant is the Lessee of a portion of the property known as and located at 313 Durham Avenue, also known as Lot 9, in Block 488 in the Borough of South Plainfield.

2. The premises in question is 133,294 square feet and presently being used as heavy machinery repair and storage located in the M–3 Zone.

3. The applicant is requesting a use variance to construct an unmanned Cellular Telecommunications facility consisting of 456 square foot structure,

housing radio equipment and a 90–foot tall steel monopole with up to twelve 54 feet by 12 feet panels.

4. The applicant testified that the proposed antenna would assist in increasing the capacity and coverage (signal strength) on their present cellular communications systems.

5. The applicant testified that the site in question, which is located on a threshold street, in the general area of the intersection of Durham Avenue and Route 287, was one of many sites they considered for the proposed telecommunications facility.

6. The applicant refused to disclose the identity of the other location.

7. The applicant admitted that the site in question was lower than some of the other alternative sites.

8. The applicant also admitted that selecting an alternative site that was more elevated may allow the applicant to reduce the overall height of the antenna.

9. There is antenna of the approximate size required by the applicant within the immediate area of the site which could have been modified or reconstructed to accommodate the communications needs of the applicant.

10. The area immediately surrounding the premises in question is an area in transition, at the very threshold of a significant amount of the motor vehicle traffic into South Plainfield and vulnerable to inappropriate development.

11. Substantial deviations from the Zoning Plan in this area could have a permanent adverse effect on the municipal planning for this area.

12. The objectors to the applicant offered expert testimony that some of the existing towers in the general area (including Nextel Tower) could provide the required service requested by the applicant.

13. The expert witnesses offered by both the applicant and the objectors indicate a digital technology will increase the capacity of existing transmission facilities for a minimum of five times to a maximum of twenty times their existing capacity.

14. The applicant testified that it would be changing to digital technology over the next two years.

15. Digital technology would significantly decrease the need for towers similar to the one proposed in this application.

16. The Board agrees with the finding of the objector's planner that the erection of this facility would detract and deter from future development of the area in question.

17. The Board agrees with the objector's planner that the facility in question would be esthetically unpleasing to both future development of the area.

18. The applicant, through its witnesses, acknowledges that the anticipated introduction of digital communication technology had significantly decreased in need for the monopoles of the proposed height.

19. The applicant acknowledges that it was possible to accomplish some of its intended capacity and coverage goals, especially for stationery users, by the use of micro-cells within the intended area.

Both the Law Division and the Appellate Division also assumed that the monopole was an inherently beneficial use. The Law Division, however, reversed the Board's decision, concluding that the record did not establish that the monopole would be detrimental to the public good. Finding that substantial evidence in the record supported the Board's conclusions, the Appellate Division

*CONCLUSIONS*

1. The applicant has failed to demonstrate that the relief can be granted without substantial detriment to the intent and purpose of the Zoning Ordinance and Zoning Plan, being a deterrent to the permitted use development of the area in question.

2. The applicant has failed to demonstrate that the relief requested can be granted without substantial detriment to the public good, being an esthetic detriment to a main corridor within the Borough.

3. The applicant offered no conditions that would ameliorate the negative impact upon the public good and the intent and purpose of the Zoning Plan and Zoning

Ordinance.

4. The detriment to the public good, the Zoning Plan and Zoning Ordinance, outweighs the public interest of the use.

5. It is the determination of the Board that the desired goal to the capacity and coverage for the mobile telecommunication system, can be accomplished in other ways which would not adversely impact upon public good or the intent and purpose of the Zoning Ordinance or Zoning Plan.

6. The site in question is inappropriate for the proposed use.

7. The proposed use on the site in question would have a substantially adverse impact on the zoning and planning of the Borough of South Plainfield.

8. The proposed use does not provide public benefit, but simply provides additional service to customers of Comcast.

9. The Board determined that the inherent beneficial characteristic of the proposed use is significantly less compelling than other types of inherently beneficial uses such as churches, schools, hospitals, low and moderate income housing, day care centers, etc.

10. The increased service which may result from the proposed use could be accomplished by other means such as micro-cells, using existing towers and digital technology.

11. The significant detriment to the Borough and the Zoning Plan and Zoning Ordinance should not be outweighed by the minimal inherent beneficial characteristic of the application.

reversed the judgment of the Law Division. 305 *N.J.Super.* 151, 170–71, 701 *A.*2d 1281 (1997). The court accepted the Board's conclusions that Comcast should have used an existing tower, that increased use of digital service would eliminate the need for the monopole, and that the grant of the variance would substantially impair the development of the zone. *Ibid.*

Judge D'Annunzio dissented. *Id.* at 171, 701 *A.*2d 1281. He concluded that the monopole was inherently useful, that its negative effect was minimal, and that the pole's usefulness outweighed its minimal negative effect. *Id.* at 174–75, 701 *A.*2d 1281. For the dissent, the "proposed location of the monopole in the Borough's most permissive industrial zone [was] the most important fact in this case." *Id.* at 175, 701 *A.*2d 1281. Also, the dissent rejected the testimony of the objector's planner as a "net opinion." *Ibid.*

Comcast appealed as of right. We remanded the matter to the Appellate Division for reconsideration in light of *Smart.* On remand, the Appellate Division reaffirmed its original decision reversing the judgment of the Law Division. 314 *N.J.Super.*, *supra* at 104, 714 *A.*2d 315. Again, Judge D'Annunzio dissented. *Ibid.* The dissent reasoned that the facts in the present case are similar to those in *Smart* and that the grant of a variance similarly would not impose a substantial adverse impact on the zone plan. *Id.* at 104–05, 714 *A.*2d 315. Finally, the dissent concluded that the monopole's contribution to the general welfare outweighed its minimal adverse effect. *Ibid.* Once again, Comcast appealed as of right.

## II.

The evidence before the Board demonstrated that Comcast proposed to construct a 90–foot monopole and an unmanned 456 square foot equipment building. The monopole would be located

---

WHEREFORE, the applicant's request for a use variance to construct cellular telecommunications facility, a 90 foot tall steel monopole, is hereby denied.

in the M–3 zone on a leased portion of a 130,000 square foot lot, the balance of which is used to park trucks and heavy equipment. Comcast requested a use variance for the monopole and, because of a 50–foot limit on the height of structures in the M–3 zone, a bulk variance.

The M–3 zone is the least restrictive zone in South Plainfield, permitting warehouses, various kinds of manufacturing, light manufacturing, office buildings, and research facilities.[2] Residential

---

2 The zoning ordinance provides that the M–3 zone permits:

A. All uses permitted in the M–1 Zone.

B. The manufacture, fusing and production of quartz and of silica and quartz products; the manufacture of electrical instruments and electrical components; the manufacture and production of all types of precious and base metals and alloys in ingot form, refining, melting, casting and working of precious and base metals and alloys; manufacture and production of precious base and alloy metal products, including processing, milling, machine fabrication and assembling; manufacture and production of non-hydrocarbon chemical and catalyst products, plating compounds and solutions, diamonds and other precious stone products, brazing fluxes, light metal parts, liquid gold and other precious and base metal organic based paints, casting compounds and cements, gas measuring equipment and gas generating and storage equipment.

C. Warehouse and distribution center, including sales at retail of a "clearance" nature, provided however that such sales activities occur not more frequently than one every quarter for a period, in each case, of not more than seven (7) consecutive days duration.

D. Lumber Yards.

The zoning ordinance provides that the M–1 zone permits:

A. Office buildings for executive, administrative, business, educational or professional purposes.

B. Scientific or research laboratories devoted to research, design and/or experimentation; process and fabricating incidental thereto may be permitted.

C. Uses of a light manufacturing nature as follows:

(1) Manufacturing of light machinery comprising any of the following carburetors, and small machine parts; cash registers; sewing machines; and typewriters, calculators and other office machines.

(2) Fabrication of metal products comprising any of the following: baby carriages, bicycles and other non-motorized vehicles; metal furniture; musical instruments; sheet metal products; and toys.

(3) Fabrication of paper products comprising any of the following: bags, bookbinding; boxes and packaging materials; office supplies; and toys.

uses are expressly prohibited. A Conrail railroad track runs through the middle of the zone, and an interstate highway, I–287, bounds the zone on the west. On the other side of I–287 is the M–2 zone, which expressly permits "Television and Radio Studios and Antennas," but not cell towers or monopoles. The M–2 zone is also developed for industrial use.

Comcast's radio frequency engineer, Seth Parkoff, explained that Comcast needed the monopole because of the high usage of cell phones along I–287 and at the nearby Middlesex Mall. A second need was to improve the "hand off" or transfer of calls between towers.

Two other towers in the immediate area could not meet those needs. In 1994, the Board had approved the erection of a tower in the M–3 zone for Nextel, a competing telecommunications carrier. According to Parkoff, the Nextel tower, which was two miles away, was outside Comcast's "search ring" and could not address Comcast's capacity problem. The other tower, which was next to Comcast's proposed site, could not support the proposed antennas. The selected site, one of ten that Comcast considered, was in the center of the search area, and was the only site available. In brief, Comcast could not serve its customers from existing facilities.

Although the M–3 zone prohibits residential uses, several non-conforming residences are located in the zone. A group of objecting residents of the M–3 zone presented conflicting testimony from a communications consultant, Richard Wolf. He questioned

---

(4) Fabrication of wood products comprising any of the following: boats; boxes, cabinets and wood workings; furniture and toys.

(5) Food and associated industries comprising any of the following: bakeries; bottling of food and beverages; food and cereal mixing and milling; food processing; food sundry manufacturing; and ice cream manufacturing.

(6) Other permissible industry comprising any of the following: concrete and plastic products; electronic products; glass and glass products manufacturing; jewelry manufacturing, including polishing; leather goods manufacturing, except, curing, tanning and finishing of hides; motion picture exchange; pharmaceutical products manufacturing.

the continuing need for the monopole in light of Comcast's proposed conversion from analog to digital communication. He also suggested that Comcast could reinforce the adjacent tower or use "mini cells" or "micro cells" to provide service. Mini or micro cells provide service to a small area and do not require monopoles.

In rebuttal, Comcast called its director of wireless systems engineering, David Stern, who testified that use of the Nextel tower would interfere with other parts of Comcast's telecommunications system. Stern also explained that Comcast could use the adjacent tower only by replacing it. Finally, he rejected the use of micro cells, stating that twenty such cells would be needed to cover the area, each of which would require some facilities in the municipality.

Comcast also presented a licensed land use planner, Janice Talley, who testified that the monopole would not cause problems concerning noise, sewerage, drainage, or traffic. Because of its location in a zone permitting industrial uses, moreover, the monopole would not produce a significant impact on the development of the zone.

The objectors' land use planner, John Chadwick, observed that the site was lower than surrounding areas and that the tower, therefore, would be higher. The monopole, which he deemed unsightly, would discourage office use and encourage "heavier industrial uses." He characterized the area as being in transition from farmland and scattered residential development to manufacturing and office use, a characterization contradicted by the Borough master plan, which described the area as "very well suited to industrial uses."

Individual objectors urged that the monopole be placed elsewhere in the municipality. Unfortunately, the South Plainfield Master Plan does not provide for telecommunications towers. The zoning ordinance does not expressly permit telecommunication towers anywhere, and the municipality has not identified any sites where such towers could be located.

### III.

 "Judicial review of the decision of a Planning Board or Board of Adjustment ordinarily is limited. A board's decision 'is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable.'" *Smart, supra*, 152 *N.J.* at 327, 704 *A*.2d 1271 (quoting *Sica v. Board of Adjustment*, 127 *N.J.* 152, 166–67, 603 *A*.2d 30 (1992)). The issue for a reviewing court is whether the board decision "is supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion." *Ibid.*

 Generally speaking, use variance applications require identifying and weighing the negative and positive criteria under *N.J.S.A.* 40:55D–70d. The positive criteria test whether a proposed use promotes the general welfare and is particularly suited for the site. With telecommunications towers, an FCC license generally establishes that the use promotes the general welfare. *Smart, supra*, 152 *N.J.* at 336, 704 *A*.2d 1271. Comcast's license satisfies that requirement. Consequently, this appeal centers on the suitability of the site and the satisfaction of the negative criteria.

 To demonstrate that a site is particularly suited for a telecommunications facility, the applicant initially must show the need for the facility at that location. Comcast proved through competent expert testimony that its existing capacity to serve the public in the area was inadequate. The expert also established that the proposed site would redress that lack of capacity. Additionally, the monopole would facilitate the "hand off" of signals from other telecommunications facilities. For technical reasons, Comcast could not use existing telecommunications facilities at alternative sites. In brief, the record shows that Comcast needs the monopole to meet the public demand for telecommunications in the area.

The site is located between I–287 and a railroad. It is in an industrial zone that permits heavy and light manufacturing, office

buildings, and research facilities. As Judge Wolfson concluded in the Law Division, "This seems to be a particularly appropriate site in any event."

To satisfy the negative criteria, an applicant must show that the use will not substantially impair the purpose and intent of the zoning ordinance, or constitute a substantial detriment to the public good. With telecommunications facilities, "we will weigh, as we would with an inherently beneficial use, 'the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.'" *Id.* at 332, 704 *A.*2d 1271 (quoting *Sica, supra,* 127 *N.J.* at 166, 603 *A.*2d 30). Under the Telecommunications Act of 1996, (Telecommunications Act), *Pub.L.* No. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 15 *U.S.C.A.,* 18 *U.S.C.A.,* and 47 *U.S.C.A.*), municipalities may not prohibit telecommunications facilities. 47 *U.S.C.A.* § 332. In *Smart,* we encouraged municipalities to adopt ordinances identifying zones and sites for such facilities. 152 *N.J.* at 334–36, 704 *A.*2d 1271. South Plainfield, however, has neither expressly zoned for telecommunications facilities nor identified appropriate sites. By defaulting, South Plainfield has forced telecommunications carriers to take the initiative in locating suitable sites. Assuming that the need for telecommunications facilities can be established, the question is where should they be located. In making that observation, we do not suggest that every site is suitable or that every facility is necessary. We seek only "to facilitate the decision of cases involving the location of telecommunications facilities with an appropriate regard for both the need and location of those facilities." *Id.* at 336, 704 *A.*2d 1271.

Uncontradicted evidence at the Board hearing demonstrated that the monopole will not generate noise or traffic and will not impose any burden on city services, such as sewers or water. An abiding concern with telecommunications facilities, however, is their height. The aesthetic impact of a 90–foot monopole in an industrial zone, however, will be minimal. In another case, a

comparable structure in a residential zone could impose a more substantial adverse impact.

Although the objectors' planner opined that the monopole would "derail" the development of the M–3 zone, he did not support his opinion with any studies or data. His opinion, moreover, contradicts the Borough's Master Plan. As Judge D'Annunzio recognized in his dissent, the expert's statement was tantamount to a net opinion that could not reasonably support the Board's finding that the monopole would substantially impair the zone plan and zoning ordinance. 305 *N.J.Super.*, *supra*, at 175, 701 *A*.2d 1281. Similarly, the record does not reveal any detriment to the public good from the construction of the monopole. The conclusion follows that Comcast has satisfied the negative criteria.

We likewise conclude that the Board failed properly to weigh the positive and negative criteria. Given the escalating demand for telecommunications services, the Board erred in characterizing the public benefit from the monopole as "minimal." The benefit from those services, moreover, outweighs the slight impact on the industrial zone. It follows that the denial of the variance for the monopole will not withstand judicial review.

Our dissenting colleague would prolong the matter by remanding it to the Board. As in *Smart*, however, we believe that a remand is unnecessary.

Although the Board assumed that telecommunications towers were inherently beneficial, its resolution rejects the public benefit from the proposed monopole. The Board concluded that the monopole "does not provide public benefit, but simply provides additional service to customers of Comcast." Concerning the negative criteria, the Board reached the unsupported conclusion that the monopole "would detract and deter from the future development of the area in question" and that it "would have a substantial adverse impact on the zoning and planning of the Borough of South Plainfield." The Board's reluctance to weigh

properly the evidence concerning the positive and negative criteria leads us to conclude, as in *Smart*, that the appropriate resolution is to reinstate the Law Division's order directing the approval of the variances.

Throughout the proceedings, the focus has been on Comcast's request for the use variance. Our review of the record establishes that Comcast is entitled both to that variance and the bulk variance.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division is reinstated.

O'HERN, J., dissenting.

The telecommunications industry is among the fastest growing industries today. "Industry analysts predict that between 122,000 and 250,000 new cell sites will be needed to meet the growing demand of cellular phone subscribers in the United States alone." Ben Campanelli, *Planning for Cellular Towers* (visited May 18, 1999) <http://www.webcom.com/~pcj/articles /cam128.html>. This need for "expansion of cellular communications systems, in both capacity and geographical coverage, has resulted in the inevitable conflict with local land-use planning and zoning laws. In many instances, the development of this new technology has outpaced the ability of communities to enact zoning ordinances which accommodate cellular telephone services." Nancy M. Palermo, *Progress Before Pleasure: Balancing the Competing Interests of Telecommunications Companies and Landowners in Cell Site Construction*, 16 *Temp. Envtl. L. & Tech. J.* 245, 246 (1998) (footnotes omitted).

This conflict is heightened by the concerns of local citizens that the construction of cellular towers "will have [an] adverse impact[ ] on aesthetics, property values, or health and safety." Gregory Tan, *Wading Through the Rhetoric of the Telecommunications Act of 1996: Uncertainty of Local Zoning Authority over Wireless Telecommunications Tower*, 22 *Vt. L.Rev.* 461, 462 (1997). When Congress passed the Telecommunications Act of 1996, deregulat-

ing the industry with certain substantive and procedural limitations,[1] it explicitly retained the authority of local government to adopt zoning regulations for the industry. *Ibid.*

> The Telecommunications Act of 1996 has been described as "expansive legislation designed primarily to increase competition in the telecommunications industry." It was passed "in order to provide a 'pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services....'"
>
> > [Carol R. Goforth, *"Not in My Backyard!" Restrictive Covenants as a Basis for Opposing the Construction of Cellular Towers*, 46 *Buff. L.Rev.* 705, 726–27 (1998) (footnotes omitted).]

Notwithstanding the deregulation of the industry, wireless service facilities sought to present themselves as public utilities, entitled to a favored status as a public utility or as an inherently beneficial use, *see Sica v. Board of Adjustment Tp. of Wall*, 127 *N.J.* 152, 603 *A.2d* 30 (1992). In *Smart SMR of New York, Inc. v. Borough of Fair Lawn Board of Adjustment*, 152 *N.J.* 309, 704 *A.2d* 1271 (1998), we made it clear that wireless services facilities are neither regulated public utilities nor inherently beneficial uses. The fact that "America's fast-paced and convenience-driven society demands immediate gratification" does not warrant a finding that wireless service facilities are inherently beneficial. Timothy L. Gustin, *The Perpetual Growth and Controversy of the Cellular Superhighway: Cellular Tower Siting and the Telecommunica-*

---

[1] The Telecommunications Act of 1996 provides:

The substantive limitations on local authority decree that zoning regulations "shall not unreasonably discriminate among providers" and "shall not prohibit ... the provision of personal wireless services." § 332(c)(7)(B)(i)(I) & (II). The statute also outlaws governmental consideration of "the environmental effect of radio frequency emissions," so long as the emissions comply with FCC regulations. § 332(c)(7)(B)(iv). Procedurally, the Act requires local governments to act expeditiously on requests for zoning variances, § 332(c)(7)(B)(ii), and requires zoning denials to be in writing and based on substantial evidence, § 332(c)(7)(B)(iii). Finally, subsection (c)(7)(B)(v) provides jurisdiction to federal courts over controversies arising under § 332.

[*PrimeCo Personal Communic., L.P. v. Village of Fox Lake*, 26 *F.Supp.*2d 1052, 1058–59 (N.D.Ill.1998), *recons. denied*, 35 *F.Supp.*2d 643 (N.D.Ill. 1999).]

*tions Act of 1996*, 23 *Wm. Mitchell L.Rev.* 1001, 1002 (1997). If a dairy processing facility is not an inherently beneficial use, *Kohl v. Mayor and Council of Fair Lawn*, 50 *N.J.* 268, 279, 234 *A*.2d 385 (1967), instant personal communication is not. Rather, in *Smart*, *supra*, we held that any use variance for cellular tower sites must be "particularly suited for the proposed site". 152 *N.J.* at 332, 704 *A*.2d 1271 (citing *Medici v. BPR Co.*, 107 *N.J.* 1, 4, 526 *A*.2d 109 (1987)).

This case is much like a dog chasing its tail; it can never catch up because it started out on the wrong premise. The zoning board and the Law Division proceeded on the assumption that wireless services facilities are inherently beneficial uses. *Ante* at 7, 733 *A*.2d at 455. The zoning board denied the variance finding that the "minimal benefit from the monopole did not outweigh the public detriment...." *Ante* at 18, 733 *A*.2d at 446. The Law Division reversed the zoning board on the basis that the proposed cell tower was an inherently beneficial use. The Court now reinstates the judgment of the Law Division that was based on a flawed premise. (In fairness to the excellent judge of the Law Division, it is necessary to note that the Law Division was bound by existing Appellate Division decisions that cellular towers were inherently beneficial uses.)

It makes good sense and is only fair that we permit the body "best equipped to pass initially on such applications." *Ward v. Scott*, 16 *N.J.* 16, 105 *A*.2d 851 (1954). This application should be properly presented to the zoning board of adjustment. A special-reasons variance that is not inherently beneficial must be rooted in the land itself, not the use.

> Although certain commercial uses may inherently serve the general welfare in a particular community, the typical commercial use can be better described as a convenience to its patrons than as an inherent benefit to the general welfare. For such uses, any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise.
>
> [*Kaufmann v. Planning Bd. for Tp. of Warren*, 110 *N.J.* 551, 563, 542 *A*.2d 457 (1988) (citing *Medici, supra*, 107 *N.J.* at 18, 526 *A*.2d 109).]

In order that the variance be granted, there must be evidence that the site is particularly appropriate for a ninety-foot tower.

> A mobile communications facility, which requires construction of a tower or monopole, is not suitable for every site. Although such facilities may promote the general welfare, towers and monopoles can pose special land use problems. A structure that exceeds permitted bulk requirements, particularly those pertaining to height, may be more appropriate in one zone than in another. It is not that towers or monopoles universally are aesthetically displeasing.... The point is that some sites are better suited than others for towers or monopoles.
>
> [*Smart, supra,* 152 *N.J.* at 331, 704 *A.*2d 1271.]

In *Smart,* I could agree that when there was already an existing ninety-foot tower at the site, the site was particularly suited for another tower. Although there was evidence before the Board that there was an existing construction tower at the site, the variance application proceeded without a focus on the issue of whether the site was particularly appropriate or some other site might have served as well. Instead of applying the "particularly appropriate" standard under *Smart,* the experts for both the plaintiff and defendant misapplied the "inherently beneficial use" balancing test under *Sica, supra,* 127 *N.J.* at 167, 603 *A.*2d 30.

On another occasion I had observed that the Court had viewed itself as a sort of shadow cabinet determining how to conduct the affairs of a department of State government. *Woodland Private Study Group v. State,* 109 *N.J.* 62, 76–83, 533 *A.*2d 387 (1987) (O'Hern, J., dissenting). In this case, the Court has established itself as a state-wide zoning board, determining, as a matter of original jurisdiction and first impression, that the site is particularly appropriate for this tower. *Medici, supra,* 107 *N.J.* at 18, 526 *A.*2d 109. Fortunately, this may be a vestigial exercise of jurisdiction by the Court because zoning boards of adjustment will in the future be prepared to channel future applications for cellular towers into the proper format.

The zoning board of adjustment is the "best equipped" agency to judge the variance application initially. *Ward, supra,* 16 *N.J.* at 23, 105 *A.*2d 851. I would remand the application to the board.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, STEIN and COLEMAN—5.

*For remandment*—Justice O'HERN—1.