**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1492-24

UNITED HEARTS ISLAMIC
ACADEMY,

    Plaintiff-Respondent,

v.

ZONING BOARD OF THE
TOWNSHIP OF WILLINGBORO,

    Defendant-Appellant.

_____

> Argued on December 1, 2025 – Decided May 19, 2026
>
> Before Judges Sabatino, Natali and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0074-24.
>
> Eric J. Riso argued the cause for appellant (Zeller & Wieliczko, LLP, attorneys; Eric J. Riso, on the briefs).
>
> Robert S. Baranowski, Jr. argued the cause for respondent (Hyland Levin Shapiro LLP, attorneys; Robert S. Baranowski, Jr. and Peter A. Chacanias, on the brief).

PER CURIAM

Defendant Zoning Board of the Township of Willingboro (the Board) appeals from a December 19, 2024 order that vacated its denial of plaintiff United Hearts Islamic Academy LLC's (United Hearts), application for a use variance under N.J.S.A 40:55D-70(d)(1), and for additional bulk variances. The variance relief related to an undisputed beneficial use – the construction of a two-story school building and an additional one-story multipurpose building. In addition to vacating the Board's resolution denying United Hearts' use variance, Judge Jeanne T. Covert's December 19th order also remanded the matter for a rehearing and redetermination consistent with its written opinion issued on November 12th. We affirm for the reasons expressed in Judge Covert's well-reasoned written decision, and accordingly remand for the Board to undertake additional fact finding and further analysis of the pertinent factors.

I.

United Hearts currently operates a 4,700 square foot one-story childcare center at 248 Pennypacker Drive, Block 5.02, Lot 24 in Willingboro Township (the site). In its application, United Hearts proposed to build a 9,520 square foot two-story school building adjacent to the existing childcare center. They also sought to construct an additional 2,000 square foot one-story, multipurpose

2

building, the extension of a wraparound parking lot, and a 1,750 square foot playground between the proposed school and the existing childcare facility. United Hearts' application required a use variance because the proposed facility is located in the township's B-1 District in which educational facilities are not a permitted use.

United Hearts has maintained through its mission statement that it operates the childcare center to create a healthy Islamic academic environment for children to learn, grow, feel happy, and build self-confidence. In furtherance of that mission, United Hearts sought (d)(1) use variance relief to construct the proposed two-story school building, the multi-purpose building, an extension of the wraparound parking lot, and a stormwater detention basin.

United Hearts specifically also sought a bulk variance for lot coverage of 66.4%, which was greater than the 50% permitted in the zone. In addition, they sought a bulk variance for parking where 105 parking spaces are required and 49 were proposed. Their application was limited strictly for review of a use variance and the associated bulk variances. In the event the variances were granted, a subsequent application for site plan approval would transpire in the normal course.

A-1492-24

<u>The Board's Hearing of United Hearts' Application</u>

The Board held a hearing on United Hearts' application and exclusively voted on the (d)(1) use variance, as its denial led the Board not to vote on the associated bulk variances. The Board denied the requested (d)(1) use variance with a vote of four opposed and three in favor. The Board considered testimony on behalf of United Hearts from: Jamil Hantash, the operator of the existing one-story childcare center; Joseph A. Mancini, a professional engineer and planner; Nik Kuzowsky, a registered and licensed architect; and Dan McGinnis, a certified professional traffic operations engineer. The Board also heard testimony from Bennet Matlack, the Township's Zoning Board engineer and Christopher Dochney, the Zoning Board planner.

Mr. Hantash testified as to the operational details of the proposed school and stated the existing daycare would remain open in addition to the proposed school building. He also stated that twenty to twenty-five staff would operate the school and ten staff members would operate the day care. He further testified that 200 students maximum would be enrolled at the proposed school and 75 students maximum at the daycare. Mr. Hantash provided that in order to maintain the traffic from pick-up and drop-offs at the schools, a dedicated

4

employee would be stationed as a traffic controller to direct traffic in and out of the site.

He also detailed the drop-off system as a staggered system to first usher in elementary students, then middle school students, and then high school students controlled by a large circle for one way in and one way out in order to not affect the Pennypacker Drive flow of traffic. Mr. Hantash stipulated that the students old enough to drive will not be permitted to drive to school and buses will not be offered. He also agreed that the forty-nine proposed parking spaces would only be available for the thirty-five staff members and fourteen potential visitors and all potential events would be held in centers off site.

Mr. Mancini described the proposed use variance conditions as a two-story building, a one-story building, and a counterclockwise circulation pattern for traffic flow. He testified that the site would have drop-off lanes along the south and east sides of the buildings. When the Board expressed concerns about vehicles stacking up during pickup times, Mr. Mancini testified that the site can easily accommodate up to eleven vehicles. The Board also expressed concerns with respect to emergency vehicles such as large fire trucks and Mancini responded that the site would adequately provide for safe and appropriate circulation of all emergency vehicles.

A-1492-24

Mr. Kuzowsky's testimony generally described the layout of the two-story school and one-story multipurpose buildings. He explained the structures' floor plans, exterior, and the construction materials to be used.

Mr. McGinnis summarized the traffic and parking generation letter submitted along with the application before the Board. He approximated the expansion of the existing school would generate a total of 104 trips on and off site during a weekday. He stated that permissible uses within the B-1 District such as a strip retail plaza, convenience store, a drive-through bank, or a drive-through coffee shop would "all generate more traffic than the proposed school expansion would."

Mr. McGinnis stipulated to various conditions for approval as to traffic operations such as: abiding by the staggered traffic operations detailed by Mr. Hantash; obtaining then current 2023 traffic counts, as the traffic volume data utilized was from 2019; analyzing the capacity of traffic signals and site driveways to accommodate the additional traffic to confirm operations are within acceptable parameters; and applying for a letter of no interest from the New Jersey Department of Transportation (NJDOT) indicating that an access permit is not required. He also stated that he was confident an access permit would not be required, that the proposed traffic pattern will flow traffic

6

effectively, and that traffic will not pose a problem on site or in the surrounding area as a result of the proposed development.

Mr. Matlack testified on behalf of the Board and explicitly acknowledged that United Hearts "addressed the comments in our review letter" and with respect to "discussion about the parking and the operations of the site . . . [they] took care of all the engineering aspects." Mr. Dochney, the Board's planner, stated he found a "real <u>potential</u> negative impact . . . from a planning perspective is parking and traffic . . . [<u>b</u>]ut in terms of the actual use variance . . . [he was] in general agreement with Mr. Mancini's testimony." (Emphasis added). A member of the public subsequently testified and expressed concerns about developments across the street from the proposed school.

Prior to conducting a vote on the use variance, the Board's solicitor discussed United Hearts' stipulations as a condition of approval to provide fire safety proofs, current traffic counts, an application to the NJDOT for a letter of no interest or an access permit, implementation of the testified operations plan, and addressed student pedestrian access to the site. The solicitor further stated that according to himself and the Board's experts "in doing th[e] balanc[ing] test, [United Hearts' use variance] come[s] out on the positive side, and there's

enough proofs there and . . . [they] addressed the conditions and callouts that were contained in the [Board's] review letters."

Following the solicitor's statements, a Board member moved to approve United Hearts' application. The Board then conducted a vote on the use variance and one Board member voted "no," reasoning that "traffic can get backed up now when it's just a daycare. So it's the traffic issue for me . . . I don't think the staggered pattern has convinced me . . . I know that traffic pattern and . . . I don't know how much staggering you can do." The other Board members voted "no" and similarly reasoned they were concerned that the traffic would cause a substantial detriment to the public good. The remaining three members all voted in support of the motion to approve the application.

Subsequent to the decisions to deny the application, the Board's solicitor inquired whether they had "made the determination that the anticipated traffic in that location will cause a substantial detriment to the public good." The Board's solicitor also asked, subsequent to each of the Board members' responses, whether they had "done the balancing test and . . . made a determination that the negative outweighs the positives, notwithstanding the conditions that [United Hearts] agreed to." In its resolution, the Board detailed

plaintiff's application, summarized the testimony of the witnesses, and reflected the Board members' concerns about traffic to justify its denial.

The Board's resolution considered the application submitted by United Hearts and identified the public interest at stake, acknowledging the inherently beneficial nature of the proposed development. The resolution detailed United Hearts' witnesses' testimonies which supported the positive criterion. The Board examined the detrimental effects that could result from granting the use variance and focused primarily on concerns about traffic congestion, inadequate parking, and the lack of sidewalks.

The Board also memorialized various board members' and members of the public's concerns with respect to their skepticism about the efficacy of United Hearts' proposed mitigation measures as to the on-site staggered traffic operations. The resolution further describes the Board's considerations as to United Hearts' willingness to reduce the potential detriments, stipulations of proffering updated traffic data, and acquisition of an NJDOT letter of no interest as the estimated 100 additional trips are considered "significant" by the State. On balance, the Board weighed the positive and negative criteria and concluded that the negative impacts of the proposed development would cause a substantial detriment to the public good.

A-1492-24

United Hearts filed a complaint in lieu of prerogative writs to reverse and vacate the Board's resolution and to declare the application approved and later filed a motion to remand the matter for the Board to conduct further analysis of its application. Judge Covert denied the motion and provided a written statement of reasons detailing why she found a remand inappropriate at that point. The judge explained that United Hearts' motion effectively asked her to address the merits of one portion of its case, in a vacuum, without the benefit of examining the entire record, or allowing briefing and argument on the variety of issues raised by the action in lieu of prerogative writs.

Judge Covert then conducted a trial and addressed the merits of plaintiff's application. She issued a November 12, 2024 order denying United Hearts' request to reverse and vacate the Board's decision and instead determined a remand to the Board for a rehearing and redetermination was required. In her written opinion, Judge Covert summarized the parties' arguments and the testimony presented at the hearing before the Board. Judge Covert also addressed the balancing test detailed in Sica v. Bd. of Adjustment of Twp. of Wall, 127 N.J. 152, 165-66 (1992), applicable to applications for beneficial use variances.

Judge Covert noted that United Hearts presented outdated traffic data from 2019 but explained that they used pre-COVID traffic counts based on their belief that 2019 data was "more reflective of traffic in late 2023 than statistics from 2022 or early 2023," and also agreed to update its traffic pattern data. Judge Covert further noted that the Board expressed concerns about new developments nearby, but the record was otherwise silent on that point and any impact on traffic at the site. Judge Covert also found that the record detailed certain permissible uses in the B-1 District, which would generate even more traffic than the proposed school but concluded the record did not elaborate on this issue either, which if addressed would have aided her analysis to determine whether the Board acted in an arbitrary and capricious manner.

Next, Judge Covert turned to Mr. McGinnis' testimony regarding site traffic and found that none of the Board's experts explained or refuted that the permitted uses detailed in the trip generation data would generate more traffic than the proposed school. Judge Covert reasoned due to the data before the Board, and a failure to further develop the record in crucial areas, a remand for a rehearing was appropriate to ensure a correct and equitable result was reached. Judge Covert explained that she recognized United Hearts bore the burden of convincing the Board to allow the use variance, but she was "left without

11

sufficient resources to engage in a proper analysis of whether or not the Board acted reasonably due to shortcomings in the record on both sides. Particularly given that [United Hearts] provide[d] a reasonable basis for utilizing 2019 traffic statistics."

Additionally, Judge Covert explained that while a Board can reject or accept the testimony of an expert witness, rejection of such witnesses must have a reasonable basis in the record. Judge Covert further explained that a remand was appropriate in light of the fact that the Board rejected all of the expert witness' testimony and even seemingly rejected their own experts, including Mr. Matlack, who stated United Hearts had "addressed all of the concerns in his review letter," and Mr. Dochney, who was in "general agreement with Mr. Mancini." Judge Covert also noted that the parties' experts "agreed that the proposed use was inherently beneficial, and that traffic would not be a substantial detriment, particularly with [the] agreed upon proposed conditions." Judge Covert reasoned that the record did not reflect "evidence to support the Board's denial of the use variance" and reiterated that "while [B]oards can reject expert conclusions, . . . even the Board's experts [were] not supportive of the conclusions reached." Judge Covert therefore concluded that she required

A-1492-24

further development of the "record to clarify the issue of whether there was arbitrary and capricious conduct by the Board."

The Board filed an application for reconsideration and after a case management conference, Judge Covert entered a December 19, 2024 order vacating the Board's resolution and again remanded the matter for a rehearing and redetermination. Judge Covert's December 19, 2024 order, which vacated the Board's resolution, relied upon her November 12, 2024 written decision. The Board subsequently withdrew its motion for reconsideration and this appeal followed.

II.

Before us, the Board contends it engaged in the proper Sica analysis and properly denied the use variance by a vote of four to three. The Board maintains that even with an inherently beneficial use, an applicant must satisfy the negative criteria and asserts that United Hearts failed to meet its burden of proof with respect to this criterion. The Board also contends that its members' traffic concerns were an appropriate basis upon which to deny the application as it found the traffic would cause a substantial detriment to the public good and that the negative impact outweighed the positive, notwithstanding the conditions to which United Hearts agreed. The Board analogizes what occurred here is akin

13

to Salt & Light Co. v. Willingboro Twp. Zoning Bd. of Adjustment, 423 N.J. Super. 282, 292 (App. Div. 2011), in which we upheld a similar decision of the Willingboro Zoning Board's decision to deny a variance for an inherently beneficial use. We disagree with all the Board's challenges to the court's order.

III.

We first address the well-understood standards of review that guide our analysis, followed by a discussion of the relevant substantive legal principles related to this prerogative writs action involving a beneficial use.

"When reviewing a trial [judge's] decision regarding the validity of a local board's determination, 'we are bound by the same standards as was the trial [judge].'" Jacoby v. Zoning Bd. of Adjustment of Borough of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)). "[W]hen a party challenges a . . . board's decision through an action in lieu of prerogative writs, the . . . board's decision is entitled to deference." Kane Props., LLC v. City of Hoboken, 214 N.J. 199, 229 (2013). Thus, we must "give deference to the actions and factual findings of local boards and may not disturb such findings unless they [are] arbitrary, capricious, or unreasonable." Jacoby, 442 N.J. Super. at 462.

14

"A board acts arbitrarily, capriciously, or unreasonably if its findings of fact . . . are not supported by the record, or if it usurps power reserved to the municipal governing body or another duly authorized municipal official."  Ten Stary Dom P'ship v. Mauro, 216 N.J. 16, 33 (2013).  "[P]ublic bodies, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion."  Jock v. Zoning Bd. of Adjustment of Twp. of Wall, 184 N.J. 562, 597 (2005).  "Courts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning."  Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super 177, 199 (App. Div. 2001).

"A board's function is to make factual determinations based on the record and decide whether the applicant has satisfied the statutory criteria for a variance."  Baghdikian v. Bd. of Adjustment of Borough of Ramsey, 247 N.J. Super. 45, 49 (App. Div. 1991).  The Municipal Land Use Law gives zoning boards the power to grant or deny use, density, and height variances.  N.J.S.A. 40:55D-70(d).  "Because of the legislative preference for municipal land use planning by ordinance rather than variance, use variances [under N.J.S.A. 40:55D-70(d)(1)] may be granted only in exceptional circumstances."

15

Kinderkamack Rd. Assocs., LLC v. Mayor & Council of Borough of Oradell, 421 N.J. Super. 8, 12 (App. Div. 2011).

As a result, "a municipal board of adjustment may permit 'a use or principal structure in a district restricted against such use or principal structure' only where the applicant can demonstrate 'special reasons' for the variance" also known as "positive criteria." Ibid. (quoting N.J.S.A. 40:55D-70(d)(1)). Further, "a variance application must meet the 'negative criteria,' . . . by 'showing that [the] variance can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'" Ibid. (alteration in original) (first quoting New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adj., 160 N.J. 1, 6 (1999), then quoting N.J.S.A. 40:55D-70(d)).

"Special reasons" include "where the proposed use inherently serves the public good, such as a school, hospital or public housing facility." Saddle Brook Realty, LLC v. Twp. of Saddle Brook Zoning Bd. of Adjustment, 388 N.J. Super. 67, 76 (App. Div. 2006) (citing Sica, 127 N.J. at 159-60). "All use variance applicants must satisfy the first prong of the negative criteria, which requires proof that 'the variance can be granted without substantial detriment to the public

16                                                                          A-1492-24

good.'" Kinderkamack Rd. Assocs., 421 N.J. Super. at 13 (quoting Medici v.

BPR Co., 107 N.J. 1, 22 n.12 (1987)) (internal quotation marks omitted).

"[I]f the proposed use is inherently beneficial, the applicant's burden of

proof is significantly lessened because 'an inherently beneficial use

presumptively satisfies the positive criteria.'" Med. Ctr. at Princeton, 343 N.J.

Super. at 200 (quoting Smart SMR of New York, Inc. v. Borough of Fair Lawn

Bd. of Adjustment, 152 N.J. 309, 323 (1998)).

> The Legislature has defined an "inherently beneficial use" as one "which is universally considered of value to the community because it fundamentally serves the public good and promotes the general welfare. Such a use includes, but is not limited to, a hospital, school, child care center, group home, or a wind, solar or photovoltaic energy facility or structure." N.J.S.A. 40:55D-4. An inherently beneficial use is evaluated under the standard set forth in Sica . . . . The applicant under this more relaxed standard need not satisfy the "enhanced quality of proof" set forth by the Court in [Medici, 107 N.J. at 21].
>
> Under Medici, the first inquiry under the negative criteria focuses on the potential effects of the variance on the surrounding properties. "The board of adjustment must evaluate the impact of the proposed use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute substantial detriment to the public good." Id. at 22 n.12 (internal quotation marks and citation omitted).

A-1492-24

Satisfaction of the second prong of the negative criteria analysis normally requires the applicant also "demonstrate through 'an enhanced quality of proof . . . that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance.'"

[Advance at Branchburg II, LLC v. Branchburg Twp. Bd. of Adjustment, 433 N.J. Super. 247, 254-55 (App. Div. 2013) (second omission in original).]

In Sica, the Court developed the following four-part procedure for considering the positive and negative criteria:

First, the board should identify the public interest at stake. Some uses are more compelling than others. . . .

Second, the [b]oard should identify the detrimental effect that will ensue from the grant of the variance. Certain effects, such as an increase in traffic, or "some tendency to impair residential character, utility or value," will usually attend any nonresidential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria.

Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.

Fourth, the [b]oard should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. This balancing, "while properly making it more difficult for municipalities to

exclude inherently beneficial uses permits such exclusion when the negative impact of the use is significant. It also preserves the right of the municipality to impose appropriate conditions upon such uses."

[127 N.J. at 165-66 (citations omitted).]

This test has essentially been codified by amendment to N.J.S.A. 40:55D–70, to which the Legislature added language emphasizing that even if the applicant proposes an inherently beneficial use, the negative criteria must be satisfied. Smart SMR, 152 N.J. at 324.

A board may choose which witnesses, including expert witnesses, to believe. El Shaer v. Planning Bd. of Lawrence, 249 N.J. Super. 323, 329 (App. Div. 1991), certif. denied, 127 N.J. 546 (1991). However, to be binding on appeal, that choice must be reasonably made. Kramer v. Bd. of Adjustment, 45 N.J. 268, 288 (1965); Ocean County Cellular Tel. Co. v. Twp. of Lakewood Bd. of Adjustment, 352 N.J. Super. 514, 537 (App. Div. 2002), certif. denied, 175 N.J. 75 (2002). In addition, the choice must be explained, particularly where the board rejects the testimony of facially reasonable witnesses. N.Y. SMSA v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 338 (2004).

N.J.S.A. 40:55D-10(g) requires that a zoning board "reduce each decision on an application to writing in the form of a resolution that included findings of fact and conclusions of law." Id. at 332. "The factual findings set forth in a resolution cannot consist of a mere recital of testimony or conclusory statements couched in statutory language." Id. at 332-33. A zoning board's "resolution must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the master plan and zoning ordinance." Id. at 333. Where a variance is denied, the zoning board's factual findings "must demonstrate with reference to facts and testimony on the record . . . that the statutory requisites for the grant of a variance are absent." Cox & Koenig, N.J. Zoning & Land Use Administration § 19-7.2 (2026).

A zoning board's resolution is the benchmark against which a decision granting or denying a variance is measured. CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super 563, 580 (App. Div. 2010). A resolution must "explain fully the basis on which the Board has acted, with ample reference to the record and the pertinent statutory standards." Commercial Realty & Res. Corp. v. First Atl. Props. Co., 122 N.J. 546, 566-67 (1981) (internal citations omitted). A board's resolution "must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing

court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinances." N.Y. SMSA, 370 N.J. Super. at 333.

Where a zoning board's decision is set forth in an inadequate resolution lacking appropriate fact finding, "the reviewing court has no way of knowing the basis for the board's decision" and, therefore, cannot conduct a proper review of the board's determination. Ibid. Although a remand for a board's reconsideration of its decision and for specific factual findings supporting its determination is sometimes necessary where a resolution is inadequate, Smith v. Fair Haven Zoning Bd. of Adjustment, 335 N.J. 111, 123 (App. Div. 2000), it is "not appropriate" where "the record clearly compels a reversal of [a] [B]oard's action," N.Y. SMSA, 370 N.J. at 335.

IV.

Against this legal background, we discern no error with Judge Covert's decision that a remand was necessary for additional factual findings by the Board. The judge correctly noted based on the record before her, including the Board's resolution, that although it remained plaintiff's burden to support its need for a use variance, she was unable to "engage in a proper analysis" to determine whether the Board's denial was arbitrary or capricious. In reviewing

21

the transcripts of the municipal and trial court proceedings, as well as the court's written decisions, it is clear Judge Covert's concerns were animated by the Board's rejection of the application based on purported general traffic concerns, and its failure of the Board to explain in any meaningful way its disagreement with United Hearts' nearly undisputed expert testimony.

As Judge Covert specifically explained, plaintiff's experts and the Board concurred that the proposed use was inherently beneficial and with the agreed conditions, and that traffic would not be considered a substantial detriment. On the first point, Mr. Dochney, the Board's planner, concurred with Mr. Mancini, plaintiff's engineer, that the addition to the school was an inherently beneficial use. As to traffic issues, Mr. Dochney testified he saw only a "potential negative impact" related to parking and traffic, but notably qualified that concern when he stated, "he was in general agreement with Mr. Mancini's testimony," regarding United Hearts' use variance application. (Emphasis added).

Nor did the Board's engineer, Mr. Matlack, provide contrary testimony. Instead, he admitted United Hearts addressed all of the concerns he raised in his letter of review. Mr. Matlack noted that sidewalks could be added to assist students who choose to walk to school as a condition for any approval, but did not specifically contradict any of United Hearts' expert testimony.

A-1492-24

Specifically, Mr. McGinnis testified that the projected traffic generated by the proposed school would be approximately 100 trips during the morning and afternoon peak hours, which is less than the traffic that would be generated by other permitted uses in the B-1 District, such as a strip retail plaza, convenience store, bank with a drive-through, or coffee shop with a drive-through. He further explained that the site's design addressed any traffic concerns; notably, the lengthy drive-through lane, one-way counterclockwise circulation, and active traffic management with staggered drop-off and pick-up times without significant queuing or negative impact on Pennypacker Drive or Route 130. Mr. Mancini fully concurred with Mr. McGinnis and explained that any negative traffic impacts from the proposed school should be weighed against those of other permitted uses, and that the proposed use would not result in a substantial detriment to the public good.

Neither of the Board's experts disagreed with United Hearts' experts' traffic testimony. Indeed, Mr. Matlack agreed United Hearts addressed his engineering and traffic concerns in his review letter and there was "some good discussion about the parking and the operations of the site, and I think that took care of all the engineering aspects." Mr. Dochney also agreed the only real

23

A-1492-24

potential negative impact was parking and traffic, but he was in "general agreement with Mr. Mancini's testimony."

In light of the expert testimony, which seemingly addressed any traffic concerns, the judge was well within her authority to require further explanations as to why the Board failed to accept the experts' opinions. Indeed, the Board members never addressed, for example, United Hearts' experts' evidence that other permitted uses within the B-1 District would produce more traffic than the proposed structures. See N.Y. SMSA, 370 N.J. Super. at 338 ("While a board may reject expert testimony, it may not do so unreasonably, based upon bare allegations or unsubstantiated beliefs."); see also Nextel of N.Y., Inc. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 34, 43 (App. Div. 2003) (affirming a Board's denial of a variance based on its rejection of expert testimony where the Board's resolution provided "reasons for rejecting [the expert's] testimony").

We reject the Board's arguments that Judge Covert failed to appreciate the legal significance of United Hearts' reliance on 2019 traffic data and that evidentiary deficiency should have resulted in an affirmance of the Board's decision. Although we acknowledge the judge noted the stale nature of the information at the time the matter was before her in 2024, as discussed, the

primary animating reason for the judge's remand decision was not that United Hearts relied on 2019 traffic data. Rather, the judge's concern stemmed from the fact that the resolution and comments from the Board failed to address with necessary specificity that United Hearts' expert testimony was uncontested on all material facts, that other more intense, non-beneficial uses were permitted, and the summary nature in which the Board addressed all of the Sica factors.

Further, United Hearts' reliance on the 2019 data must be placed in context. Its traffic expert, Mr. McGinnis, based his report and testimony on the 2019 data and as explained to Judge Covert did so because post-COVID traffic patterns were not yet certain and United Hearts expressly conditioned its approval on previously updated traffic counts. On this critical point, as noted, the Board's engineer neither disputed Mr. McGinnis' conclusions nor his methodology. On the record before her, the Board's decision appeared to be based on "imprecise traffic concerns while failing to undertake the required analysis of the Sica 'balancing test' factors," and unsupported claims, based on local beliefs and sentiment such that further fact finding to clarify these points was required.

In addition, the purported staleness of the traffic data was never raised as an issue by the Board, its experts, or any Board member in support of denying

25

United Hearts' application. As best we can discern, counsel for the Board raised it for the first time as a substantive issue during the prerogative writs trial. The record shows that the Board members who voted to deny the application did so not on the vintage or accuracy of the data but rather general traffic concerns and one Board member's inquiry regarding the efficacy of the staggered drop off proposal. Further, as noted, both the Board's and United Hearts' experts acknowledged use of the 2019 data and agreed to provide updated information as a condition of any approval, without objection.

Although we acknowledge that Board members' knowledge of local conditions is typically accorded wide latitude in their exercise of discretion, this deference is not absolute, however, and does not permit, as here, a Board to reject uncontroverted expert testimony unless it is based on a reasonable, fact-based explanation in the record, not merely by conclusory statements or "peculiar knowledge." Indeed, as we have previously held, "a board may reject expert testimony, but it may not do so unreasonably, based only upon bare allegations or unsubstantiated beliefs." N.Y. SMSA, 370 N.J. Super. at 338. Our Supreme Court has also instructed that deference to local zoning boards is "predicated on the existence of adequate evidence in the record supporting the

A-1492-24

board's determination either to grant or deny variance relief." Kramer, 45 N.J. at 296-97.

Here, the primary objector on the Board stated familiarity with the area and raised general traffic concerns as opposed to objections based on evidence or data in the record. She specifically stated, she was "quite familiar with that location and the traffic can get backed up now when it's just a daycare" and the expert testimony on the "staggered pattern" did not "convince[]" her because based on the traffic patterns and school schedule she was not aware of "how much staggering you can do." As noted, and what clearly concerned Judge Covert, was there was no expert testimony or specific date presented to dispute United Hearts' traffic analysis, and the Board's own professionals agreed that it addressed the relevant traffic concerns. Again, that testimony confirmed the projected traffic from the proposed school would be less than that generated by other permitted uses in the B-1 District, such as a retail plaza or convenience store, and that the specific design—including a lengthy drive-through lane and active traffic management—would properly address anticipated traffic without significant queuing or negative impact on Pennypacker Drive or Route 130.[1]

---

[1] We are unconvinced by the Board's reliance upon Price Co. v. Zoning Bd. of Adjustment of Twp. of Union and El Shaer as both cases are factually

A remand will allow the Board to consider updated traffic data, address the expert testimony, and apply the Sica balancing test in a manner consistent with the law. This is not a case where the applicant failed to present any evidence, but rather one where the Board failed to engage with the evidence presented.

Finally, we are unpersuaded by the Board's reliance on Salt & Light Co. There, the Board included specific findings based on the record for rejecting the expert testimony and denying the variance. Salt & Light Co., 423 N.J. Super. at 292. In concluding that the applicant failed to satisfy the negative criteria for the use variance, the Board provided their full Sica findings. Id. at 286-86. Specifically, the Board detailed its findings that "'Willingboro was built many

_____

distinguishable. In Price Co., it appears the applicant's traffic experts' testimonies were contested, and the Board's traffic considerations were intimately linked to the "infamous" traffic conditions on Route 22 historically known to be "one of the most overcrowded" highways "both in volume of traffic and number of commercial and industrial establishments lining its sides." 279 N.J. Super. 327, 328, 334 (Law Div. 1993) (citing Wilson v. Mountainside, 42 N.J. 426, 434-35 (1964)), aff'd o.b., Price Co. v. Zoning Bd. of Adjustment, 279 N.J. Super. 207 (App. Div. 1994). In El Shaer, the Board was "entitled to give little weight to the [applicants'] expert's conclusion" as to traffic and rely on their "personal knowledge of traffic conditions" because the applicant failed to submit the requested traffic analysis to adequately address the Board's traffic concerns. 249 N.J. Super. at 330-31. Here, the Board denied a use variance based on their familiarity with the area and general traffic concerns but failed to specifically address United Hearts' uncontested traffic experts' testimonies or proofs.

A-1492-24

years ago as a grouping of single-family homes,' that plaintiff's proposed duplex would be located 'in the middle of a block containing only single-family homes,' and that its proposed use for two families 'would constitute a substantial detriment to the neighborhood.'" Id. at 292.

Here, Judge Covert reasoned that the Board's resolution failed to address adequately United Hearts' proofs, including the expert proofs detailing the evidence that other permitted uses would generate more intense traffic than the proposed school, or sufficiently detail their Sica findings sufficiently to permit her to conduct an appropriate analysis. The Board's resolution simply recounts the various testimonies it heard, identifies United Hearts' stipulations to a staggered traffic operations plan, and notes the Board's engineer "require[ed] the [a]pplicant to secure from the [NJDOT] . . . a letter of no interest or an access permit." Moreover, the resolution memorialized the Board member's denials were couched in traffic concerns based on their "aware[ness] of the traffic in that area." Ultimately, unlike the Board's fulsome Sica findings in Salt & Light Co., the resolution here is void of engagement with the proofs before the Board to conclude that United Hearts failed to satisfy the negative criteria for the use variance or a provision of their specific detailed findings as to what led the

Board to determine, based on or in lieu of the proofs before it, the proposed application would cause a substantial detriment to the public good.

In sum, we affirm Judge Covert's order which vacates the Board's resolution and remand to the Board for it to reconsider the application based on the evidence in the existing record, which may be supplemented to the extent required to address or rebut any purported concerns the Board expresses. The Board shall permit the parties to make such additional showings, and it shall vote again on the application and issue a resolution detailing its factual findings and conclusions of law supporting its decision as to the variances requested.

Our decision to affirm Judge Covert's order to remand to the Board should not be considered an expression of opinion on the merits of plaintiff's application or the Board's decision to deny the application and we expressly do not suggest that the Board must approve the application. We simply concur that additional fact finding would benefit the parties, and the court in the event any decision by the Board is further challenged. The Board shall consider the application anew, and decide the application based on the evidence in the existing record as supplemented and permitted in this decision. See Smith, 335 N.J. Super. at 123.

To the extent we have not addressed any of the remaining arguments raised by the parties it is because we have determined they lack sufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

31